## BALTIMORE AND OHIO RAILROAD COMPANY *vs.* WILLIS T. WINDSOR.

*Railway Crossing Accident—Automatic Signal Silent—Contributory Negligence.*

The degree of care required of one approaching a crossing, when an automatic bell of which he has knowledge is silent, is only that which an ordinarily prudent man would use under such circumstances, and not the extreme care that would be required if there were no device there to indicate safety, and whether proper care was exercised under such circumstances is ordinarily a question for the jury.                    pp. 435-440

A contention that plaintiff was guilty of negligence as a matter of law must be presented by a prayer asking for a verdict on that ground, in order that it may be considered on appeal.  p. 435

*Decided August 9th, 1924.*

Appeal from the Circuit Court for Montgomery County (PETER and WORTHINGTON, JJ.).

Action by Willis T. Windsor against the Baltimore and Ohio Railroad Company. From a judgment for plaintiff, defendant appeals. Affirmed.

The cause was argued before PATTISON, URNER, ADKINS, OFFUTT, DIGGES, and BOND, JJ.

*James A. C. Bond* and *James E. Boylan, Jr.,* for the appellant.

*Albert M. Bouic* and *Thomas L. Dawson,* for the appellee.

ADKINS, J., delivered the opinion of the Court.

This suit grows out of a collision at Buck Lodge crossing of the Baltimore and Ohio Railway in Montgomery County between a fast express train of the company and a Ford automobile truck of the plaintiff. The railroad runs east and west and the county road north and south, the approach to the crossing from the south being up grade. On the east side of the county road and south of the railroad is the station. At this point trains going both east and west run on a single track. South of the track is a switch track or siding. There is a curve in the railroad extending from some distance west of the crossing to 1,200 or 1,400 feet east thereof, and on the east side there is a cut, the deepest part of which is about eighteen feet. The station obstructs the view of the track east of the crossing to one approaching from the south and the south bank of the cut conceals trains approaching from the east, until within a short distance of the crossing. There is some conflict in the testimony as to just how far and from what points trains approaching from the east can be seen by one travelling on the county road from the south, but the photographs and accurate measurements establish satisfactorily that the line of vision along the front of the station, which is about ten feet, or perhaps a little less, south of the south rail of the switch, extends eastwardly along the track for 398 feet; and at a point about one foot north of the north rail of the switch there is an unobstructed view

eastwardly for 445 feet. The main track and the switch track are each 4 feet 8½ inches wide and the distance between them is 8 feet 3½ inches. The projection of the engine over the rail was 2 feet 7¾ inches. The accident occurred at about 5.30 o'clock on Sunday afternoon, June 12th, 1921. The plaintiff with three companions in the truck approached the crossing from the south. Cooley, one of the party, "was sitting on the right hand side on the part of the truck body. My feet were on the running board." He was facing towards the east. His position was practically in a line with, just slightly to the rear of, the plaintiff and another one of the party who occupied the seat of the car. The fourth member of the party was sitting in a chair in the truck back of plaintiff. The plaintiff was driving.

Cooley testified that they "pulled up to the crossing. He (the plaintiff) throwed his car out of gear and listened for a bell and looked for the train and didn't see no train. He started across and just about the time the front part of the truck got on the switch, about that time I got the glimpse of the train and I jumped off. They pulled across about the center of the main track and the train struck the machine in the center"; that plaintiff looked both ways; that witness said down the road before they reached the crossing 'watch the crossing'; that about four feet from the crossing they had the car in neutral, and started across in low gear; that witness jumped about the first rail on the switch. "Of course the machine Willis was driving the front part was up on the switch."

Q. Did you give any warning when you jumped? A. No, sir, I didn't have time. Q. Didn't have time to say anything to them? Did you hear the train coming? A. No, sir, just when I saw it. Q. Did you listen for it? A. Yes, sir. Q. Will you state whether or not you heard the train blow? A. No, sir, I didn't. Q. Were you listening for the train to blow? A. Yes, sir. Q. And looking too? A. We couldn't see until we got up on the switch. I couldn't see until I got from around the view of the station. Q. What, if anything, did you hear as you approached the crossing? A. I never

heard nothing. Q. Do you know where that electric alarm bell is? A. Yes, sir. Q. Will you state whether or not you heard that bell ring? A. No, sir, I didn't hear it ring.

The plaintiff, Willis T. Windsor, in answer to a request by his counsel to tell just what happened said:

"I came up past Mr. Wade's store. I was running about ten miles an hour. I slowed my machine down as I approached the crossing and stopped—stopped it about a foot to the side of the track and looked and listened and I shifted my machine in low gear and started to cross. As I got on the main track I saw the machine coming in the opposite direction. About that time I heard a roaring noise. I kind of glanced around and before I could see what it was it struck us. That is the last I remember." The machine referred to was an automobile approaching the crossing from the north, which, according to the testimony of other witnesses, stopped about thirty feet from the crossing. Plaintiff further testified that his front wheels were about a foot from the south rail of the switch when he stopped; that he looked and listened, but neither saw nor heard anything; that he looked toward the east before starting; that coming up the hill from Wade's store, which appears from other testimony was 105 feet south from the center of the main track, he was travelling about eight or ten miles an hour; that when he stopped on the switch his engine continued to run; that his car made no more noise than any other machine; that he shifted to low gear when he started to cross the tracks; that he knew there was an alarm bell there and had heard it before, but it was not ringing when he proceeded to cross the track; that he had crossed the track two or three times before the day of the accident; that he did not hear any one shouting a warning; did not see Cooley when he jumped; that the car was in good condition and he was an experienced driver; there were no curtains on the sides of the car to obstruct his view; that he looked to the right and to the left and Nicholson who sat on his right also looked; that he could not see clear down to the cut; could only see about 50 feet toward the east; that after he started off he "saw a machine coming

in the opposite direction and kind of watched him"; he continued to look ahead of him then; didn't stop again to look or listen; was struck in about two seconds.

As we have said above, we are satisfied from the position he places himself in, plaintiff could have seen, if he had looked towards the east, at least 398 feet; and if a train was not within that distance when he started to go over the tracks, it must have been at least six seconds before it reached the crossing, running forty-five miles an hour. The other two members of plaintiff's party were killed in the accident.

Two of the occupants of the car at the north of the crossing testified: One of them said he did not see the train until it ran into the truck; the other saw the smoke coming out of the cut; both of them heard the train before the accident, one of them even before it got into the cut; both of them say the automatic alarm bell did not ring. Neither of them stated whether or not he heard the whistle or bell of the engine.

Several of the train crew testified that the whistle blew and the bell rang at the usual places for that crossing. Two other witnesses also swore to this. The latter also stated they heard the automatic bell ringing.

Defendant proved that the train was running at about forty-five miles an hour. The fireman on the engine testified that he saw the truck approaching the crossing running at high speed and that it did not stop before the collision.

There was evidence on the part of the plaintiff that an automatic electric bell had been maintained at this crossing by the defendant for eighteen or twenty years; that prior to that time a watchman was stationed at the crossing. Several witnesses testified that about two hours after the accident they were at this point and observed a train passing going west and they noticed that the electric alarm bell did not ring.

The ticket agent at Buck Lodge testified that this electric bell was inspected on Saturday morning, the day before the accident, between 8 and 9 o'clock by the regular inspector

of the company, and that it was in condition after that and rang all right. Witness left the station at 3.30 o'clock Saturday afternoon, and did not return until after the accident; that the station is closed on Sundays. "Q. When you left at 3.30 was it in condition? A. I couldn't say right at that time. There wasn't a train coming at that time that I can remember, but it was in condition as far as I know. It was ringing the last train that went by."

Witness further testified that he was the only person connected with the company that would be in charge of that station from Saturday evening to Monday morning; that he went back to the station after the accident and was there between half past five and six o'clock. One train went by in that time going east and the bell rang; that when he returned Monday morning the bell was working all right for trains going both east and west "as far as I remember"; that when the bell got out of order he would notify the company at once to have it repaired; it was his duty to do so, and he always did it; didn't remember how many times he had reported the bell out of order prior to June, 1921; didn't remember whether it was out of order at all; might have reported it at other times than the day before the accident, it had been some time ago "and I don't remember how many times, whether once or twice"; that he made reports to Mr. Sanbar, the signal man; the report just before the accident was on Friday evening and Mr. Sanbar got there on Saturday morning and repaired the bell that day, and it rang all right; didn't know what was the matter with it.

There is no testimony as to any time when the bell was out of order except at the time of the accident, and a few hours afterwards, and on the Friday before; or that it was ever permitted to remain out of order. The declaration filed in the case contains three counts charging negligence respectively, as follows:

1. In the failure to give notice of the approach of the train by engine signals:

2. In the failure of the automatic signal bell to ring because of its broken condition and being out of repair.

3.   In the failure of the defendant to maintain the automatic signal in proper condition in pursuance of the provisions of article 23, section 303 of the Code of Public General Laws of Maryland.

A demurrer to the declaration and to each count thereof was overruled, issue was joined on the general issue plea.

This appeal is from a judgment on a verdict in favor of plaintiff.

There are two bills of exception, one to a ruling on evidence, and the other to the ruling on the prayers.

No point is made as to the correctness of the ruling of the trial court on the demurrer, or on the question of evidence involved in the first bill of exception; and we are asked to consider only the second bill of exception.

The plaintiff's two prayers which were granted were the burden of proof prayer as to contributory negligence, and the usual measure of damages prayer, both of which were unobjectionable if there was any case to go to the jury.

The third count of the *narr.* was properly eliminated by the granting of defendant's fourth prayer.

Its first prayer asked for a directed verdict for want of legally sufficient evidence under the pleadings to sustain a verdict for plaintiff.   Its second and third prayers asked for a directed verdict as to the first and second counts respectively.   Its fifth and sixth were as follows:

*"Defendant's Fifth Prayer.*—The court instructs the jury that even though the jury should find from all of the evidence that the crossing bell at Buck Lodge did not ring and that the servants in charge of the train which struck the truck did not give any signal by bell or whistle of its approach to said train; yet the verdict of the jury must be for the defendant if the jury shall further find from all of the evidence that the plaintiff stopped his truck with truck's front wheels one foot from the south rail of the switch over the crossing, and could have seen, if he had looked, before he reached the main railroad track of the defendant, the approaching train in

time to have stopped his truck and avoided the accident. (Rejected by a divided court.)"

"*Defendant's Sixth Prayer.*—That if the jury find from the evidence that the crossing bell did not ring at the Buck Lodge crossing to warn plaintiff of the approach of the train which struck the automobile in which the plaintiff was travelling at the time, the court instructs the jury that there is no legally sufficient evidence in this case from which the jury may find that the failure of the bell to ring was due to the negligence of the defendant corporation; and the verdict of the jury must be for the defendant on the issues joined in the second and third counts of the plaintiff's declaration. (Rejected by a divided court.)"

All of defendant's prayers were refused except the fourth. In defendant's brief it is conceded that there was some evidence that the usual engine signals were not given. This disposes of defendant's first and second prayers. They were properly refused.

The contentions of defendant here are: 1. That there was no evidence of negligence on the part of defendant in connection with the alleged failure of the automatic signal. 2. That the plaintiff was guilty of contributory negligence. 3. In any event the jury should have been instructed that it was the duty of plaintiff to continue to look and listen.

The first point is raised by defendant's third and sixth prayers. The ruling of the trial court refusing these prayers is sustained by a divided court.

The second contention here, that plaintiff was guilty of contributory negligence as a matter of law, was not presented to the trial court by a prayer asking for a directed verdict on that ground.

It remains to consider defendant's third point. This is presented by defendant's fifth prayer. That prayer sought to have the jury instructed, in effect, that even if they found plaintiff stopped his truck with its front wheel one foot from the south rail of the switch, still their verdict must be for the defendant, if the jury should further find that at some point

nearer the main track, plaintiff, if he had looked, could have seen the approaching train in time to have stopped his truck and avoided the accident. If this prayer had been granted the jury must have found for the defendant if it regarded the undisputed evidence in the case and the court's instructions, because there can be no doubt from the whole evidence that if the plaintiff had looked towards the east after he drove on the switch he could have seen the train in time to have avoided the accident.

And so the question is directly presented, must the rule, which has been so often announced in cases where a silent crossing bell was not involved, that it is the duty of one at a railroad crossing to continue to look and listen until he has passed the point of danger, and that if he fails to do so he is guilty of contributory negligence as a matter of law, be strictly applied in *all* cases, even where the failure of an automatic crossing bell to ring may have induced the traveller to exercise something less than the extreme care required in ordinary cases?

In *L. R. A.* 1916, at page 788, it is said: "It is difficult to deduce from the cases any definite rule as to the extent to which a traveler on a highway may rely upon automatic safety devices placed at railroad crossings for his protection. The cases seem to agree that the presence of such devices at a crossing may properly be regarded as having some effect upon the care required of a highway traveler, but some of the cases, while apparently recognizing this principle, require such additional precautions upon the part of the traveler when considering a concrete example, that there seems to be no practical difference between the care required when an automatic device is present and that required when no such device is maintained."

"About all that may be said is that a traveler approaching a crossing at which he knows an automatic signal is maintained, while entitled to place some reliance upon the indication of safety which silence of the signal implies, is never-

theless bound to use such care in addition as an ordinarily prudent man would use under such circumstances."

See also *Am. and Eng. Ann. Cas.,* 1918 D, at page 389; note to *Jacobs* v. *Atchison etc. Ry. Co.,* 1918 D; 33 *Cyc.* 1028.

An examination of the cases cited in the above mentioned notes will verify the accuracy of the conclusion of the authors. While there is much conflict in the authorities, the last clause quoted seems to be supported by the best considered cases; and we take it to mean that the degree of care, required of one approaching a crossing, when an automatic bell of which he has knowledge is silent, is only that which an ordinarily prudent man would use under *such circumstances,* and not the extreme care that would be required if there were no device there to indicate safety; and that whether proper care has been exercised under *such circumstances* is ordinarily a jury question.

The facts in the case of *Hicks* v. *N. Y., N. H. & H. R. Co.,* 164 Mass. 424, are strikingly like the facts of the present case, but not as favorable to the plaintiff. There plaintiff stopped 150 feet from the crossing and then went across without continuing to look. It was held that the fact that if he had continued to look he could have seen the train before he reached the track was not sufficient to take the case from the jury, the crossing bell having failed to ring. The court said: "We think the case was properly left to the jury to determine whether he exercised such care as an ordinarily prudent person is accustomed to exercise under like circumstances."

In the present case plaintiff, according to his testimony, stopped *right at the crossing* and, carefully looked and listened for signals, especially the automatic bell; and, according to defendant's own calculation, the time required for the train to run from the place where it was invisible to the crossing was only about six seconds.

We are not unmindful of the fact that prayers similar to defendant's fifth prayer were commented on by this Court

without disapproval in *N. C. Ry. Co.* v. *Gilmore,* 100 Md.
404; and *McAdoo* v. *State,* 136 Md. 452. These were cases
of open gates. But in these cases the prayers were *granted*
prayers and the defendants were appellants. It was not nec-
essary, therefore, to discuss these prayers, and they were re-
ferred to mainly with the view of emphasizing the fact that
the defendants had gotten at least as much as they were en-
titled to. Those prayers are not consistent with what we
regard as the true meaning of the decision in the *Stumpf*
case, 97 Md. 78. It is true, in the latter case it was a ques-
tion of failure to *stop,* and not of failure to *look* and *listen.*
But it is impossible to read that case through, and consider
carefully the cases therein cited and quoted from with ap-
proval, without realizing that its reasoning is in harmony
with the conclusion we have reached, that under the facts of
the present case the question of contributory negligence could
not properly have been determined as a matter of law.

In *Beasley's* case, 117 Md. 270, this Court held that the
existence of an automatic bell at a crossing did not affect the
situation as to the driver in that case, because he knew it was
out of order and could not be relied on. But there is not the
slightest intimation that it would have been so held if the
driver had not known this.

It is urged by appellant that to refuse to pass upon this
question as a matter of law would be equivalent to holding
that in *every suit* growing out of an accident at a crossing,
where there is a bell and in which there is any evidence of a
failure of the bell to ring, the question of contributory negli-
gence must be submitted to the jury.

But we are dealing only with the facts and circumstances
of *this* case. It might well be that in other circumstances it
would be proper and necessary for the court to hold the plain-
tiff guilty of contributory negligence as a matter of law, not-
withstanding the existence of the element of a silent bell.
To hold, however, that in *no* case should this element be per-
mitted to have any weight in determining whether the ques-
tion of contributory negligence should be submitted to the

jury would be not only against the weight of authority but against reason, in view of the well established rule that in considering the question of contributory negligence the conduct of the plaintiff must be taken in connection with all the surrounding circumstances. We think this prayer was properly refused.

This, of course, does not indicate our approval of the verdict; or that we would have decided as the jury did. It means, only that, in our opinion, it was a jury question.

In the opinion filed after the first argument of this case we held that the trial court erred in refusing defendant's fifth prayer. A reargument was granted mainly because, on further consideration, there was serious question in our minds as to the correctness of that ruling. The order then passed will be rescinded.

> *Order heretofore passed rescinded. Judgment affirmed, with costs to appellee.*

Offutt, J., dissents.