BALTIMORE & OHIO RAILROAD CO. *v.* STATE, USE OF ANDREWS ET AL.

[No. 119, October Term, 1947]

228

*Decided March 19, 1948.*

*Rehearing denied May 21, 1948.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*Irvine H. Rutledge* and *E. Stuart Bushong*, with whom were *Lane, Bushong & Byron* on the brief, for the appellant.

*Donald C. Sponseller* and *Stanford Hoff*, with whom were *Charles F. Wagaman* and *Sponseller & Hoff* on the brief, for the appellee.

MARKELL, J., delivered the opinion of the Court.

This is an appeal by defendant from a judgment in a suit under Lord Campbell's Act on account of the death of Olin R. Andrews in a collision between his automobile and defendant's train at Roxbury, Maryland, on September. 23, 1946 at about 2 P. M. The principal question presented is whether the court was in error in refusing to direct a verdict for defendant on the ground of contributory negligence. On this question evidence and permissible inferences most favorable to plaintiff will be stated as facts.

The collision occurred at the crossing of the single-track railroad and a county road at Roxbury Station, at the State "penal farm" (State Reformatory for Males) about six miles from Hagerstown. At the crossing the county road runs east and west; the railroad runs approximately north and south, but north of the crossing curves toward the west. The train, a regularly scheduled train due at almost exactly two o'clock, coming from the north, from Hagerstown toward Weverton, consisted of two cars and was driven by a gasoline engine in the

front part of the front car. Roxbury is a flag stop; the station was a small frame shed between fifty and sixty feet south of the county road, east of the track. Mr. Andrews was driving his Ford sedan west. He was Farm Manager at the penal farm and had been for ten years. He and his family lived in a house east of the railroad; the main building of the farm was west of the railroad. He had to cross the railroad every day to go from his house to the main building, either by the road at Roxbury Station or by a road two or three hundred yards south. It was about the same distance either way, but he more frequently used the other road. At the Roxbury crossing there was an electric bell, which was out of order and not working at the time of the collision and two days before. There is no evidence that Andrews knew it was not working.

Colonel Munshower, Superintendent of the Reformatory, and other witnesses for plaintiff characterize the crossing as very dangerous. He says the terrain is "very bad", a low terrain and a "very bad" curve, "the approach from the west to the east is even more dangerous than the one from the east to the west, but in either case the obstruction of the view is very bad" to a train coming from the north towards Weverton. A few minutes after the accident he took a number of photographs, which plaintiff offered in evidence. Other photographs, taken the next day by another witness, were also offered by plaintiff. Still others, taken nine days after the accident, were offered by defendant.

East of the railroad the county road was bordered by a thick high hedge on the north side which completely obstructed view of the railroad on that side and extended to, but not on, the railroad right of way. Beginning almost perpendicular to this hedge was a hedge running north, curving toward the west, several hundred feet long, bordering but not on the east side of the railroad right of way. Between these hedges and the east rail there were also some weeds and other foliage. West of the railroad and apparently west of the right of way

there was also thick high foliage, which limited the view of the curve from the crossing.

One witness for plaintiff says, "the view from the road to the approaching train is very bad and that view vanishes with the condition of the undergrowth along the railroad, when it is kept down, it is not so bad, then again you can hardly see"; in the morning before the accident "the undergrowth there and hedge was high, I would say you could not see approximately any more than one hundred feet up the track, there is a deep curve and the undergrowth was very bad." When you are standing twenty feet east from the east rail and looking north, he would say "you could not see fifty feet up the railroad, I do not believe you could see the railroad at all twenty feet you are back of the hedge." State Trooper Basore, another witness for plaintiff, who arrived on the scene soon after the accident, said at a point fifteen feet east of the east rail you could see, standing eye level, seventy-five to eighty feet. Another witness for plaintiff, when asked how far a train from the north could be seen from an automobile within fifteen feet of the east rail on the day of the accident, said, "I would say not over seventy-five feet". He also said weeds had been cut before, and "I would say in the next couple of days" after, the accident.

We need not consider from the photographs alone whether this testimony of these witnesses is physically impossible and is shown to be so by both plaintiff's and defendant's photographs. But see *Baltimore & O. R. Co. v. Bruchy,* 161 Md. 175, 177, 155 A. 346. Colonel Munshower, on cross-examination, when asked at what point a train from the north can be seen as you approach the crossing from the east, said, "I would say to be exact you would have to be within one car's length to actually see the train approaching until it got 150 yards or 200 yards of the crossing itself, that is about true without measuring," an automobile length, "the front of the car would have to be within about twenty to twenty-five feet of the track to get a view of that curve." He also

said that one of defendant's photographs, taken twenty feet east of the east rail, is a true representation of the situation as it existed at the time of the accident. Trooper Basore himself, on cross-examination, when shown the same photograph, said he thought you could see the track up to the third telegraph pole, and could see a trian if it was coming down there. The third telegraph pole is about 350 feet from the crossing. When asked by the court, "You do not mean to say you would not see a train further than seventy or eighty feet if you were within fifteen feet from the crossing, looking north?", he answered, "I believe you could". Sergeant May, a witness for plaintiff, says "about a car length or fifteen feet you could see up the track, I would say, a train five hundred feet."

Three witnesses, one for plaintiff, an inmate of the penal farm, and two for defendant, the engineer and a passenger on the train, testified as eye-witnesses to the collision. Plaintiff's witness, working as a "trusty", was raking the lawn in front of the head guard's house. The house was at the crossing, at the south-west corner. Witness was twenty-five feet from the crossing. He says Mr. Andrews "stopped at about ten feet from the railroad, there was no whistle or no bell ringing, no sound of a train, after stopping, he paused four or five minutes [later corrected to seconds] and started off, after he started off the locomotive came down and it happened." When he stopped the front of his car was about ten feet from the rail. "He stopped, looked both ways and started off after being stopped about five minutes [seconds]". He was about ten feet from the east rail when he stopped. He looked to the right first, then to the left. After he started his car in motion, he gave a glance to the right, as he was going over. Witness could not see the train then, did not see it until it hit him, it came out of a bend. The whistle was not blown at all. Witness never saw the train nor heard the noise until it hit Mr. Andrews.

The engineer says, at a "whistle" sign about 700 feet from the crossing he blew the whistle for the conductor to

see whether he had any passengers to get off at Roxbury. The conductor (having none) did not pull the whistle. About two hundred feet further down the engineer put the brake on, bringing his speed down from thirty-five to thirty miles per hour. Seeing no one to pick up at the station, he "knocked the brakes off and opened up", five hundred feet from the crossing. "When I went on this crossing I looked to the right and left and saw this car and in one second, I was hit." It hit the engine on the left side, right on the corner, broke the air line, so that he had no control of the train and could not put on the emergency brake. The train came to a stop six hundred and fifty-one feet south of the crossing. At five hundred feet from the crossing he blew two long and one short blast of the whistle and then "prolonged the last blast right up to the crossing". Five hundred feet from the crossing he could see a car eighteen or twenty feet east of the crossing. The automobile seemed to be coming thirty-five or forty miles per hour, "I was making thirty-two miles per hour when he shot right up". The passenger heard the engineer blow the whistle several times and "as he was approaching the crossing, this car came out from the left at that obstruction, it seemed to catch the left front corner of the coach. The car was about twenty-five feet from the crossing when he saw it; it was going at least between twenty-five and thirty miles per hour."

Whether the automobile hit the train or vice versa, the fronts of both came into contact and the automobile was dragged or thrown, east of the track, against the Roxbury station shed.

Defendant apparently concedes that the evidence is legally sufficient to show negligence on its part in failing to keep the signal bell in working condition. In addition to the evidence that the bell had been out of order for at least two days before the accident, there is evidence of defendant's witnesses that there had been previous trouble with this bell though "not any more than the balance, they are all very timid", they "go out easily".

It is also well settled that, except as qualified by reliance on the defective bell, it was the duty of Andrews to look and listen and, if necessary, stop before attempting to cross the track, and failure to do so would be negligence *per se.* The facts in the instant case and previous decisions of this court leave little scope for debate as to reliance on the defective bell. In *Baltimore & O. R. Co. v. Windsor,* 146 Md. 429, 438, 126 A. 119, 122, the court interpreted, as supported by the best considered cases, a quoted conclusion from a review of conflicting authorities in other jurisdictions, as meaning that "the degree of care required of one approaching a crossing when an automatic bell of which he has knowledge is silent, is only that which an ordinarily prudent man would use under *such circumstances,* and not the extreme care that would be required if there were no device there to indicate safety; and that whether proper care has been exercised under *such circumstances* is ordinarily a jury question." In that case the question of contributory negligence was held to be a jury question. But, as the court said in *Baltimore & O. R. Co. v. Bruchy,* 161 Md. 175, 179, 155 A. 346, 347, "We were careful to limit the decision in the *Windsor* case to the facts of that case. It was there said: 'It might well be that in other circumstances it would be proper and necessary for the court to hold the plaintiff guilty of contributory negligence as a matter of law, notwithstanding the existence of the element of a silent bell'." In the *Bruchy* case the court did so hold. We think the instant case is controlled by the *Bruchy* case.

The burden of proof of contributory negligence is upon defendant. Unless it is shown by the undisputed facts and plaintiff's evidence, the weight and credibility of conflicting evidence of the opposite parties is a jury question. But consideration of the legal sufficiency of evidence is subject to the oft-repeated truism that if a witness says he looked and did not see, when if he had looked he must have seen, such testimony is unworthy

of consideration. *Baltimore Traction Co. v. Helms,* 84 Md. 515, 526, 36 A. 119, 36 L. R. A. 215; *Baltimore & O. R. Co. v. Bruchy, supra,* 161 Md. at page 179, 155 A. at page 347. This is no less true of testimony that some one else looked and did not see. Thus the net difference between the testimony of plaintiff's witness and defendant's two witnesses is only the difference between attempting to cross, after stopping, without looking and attempting to cross without stopping or looking. Either version of the facts shows that the unfortunate man used no care at all at this familiar—dangerous—crossing and leaves no jury question as to what care an ordinarily prudent man would use under the circumstances.

A directed verdict cannot be justified by ascribing mathematical exactness to estimates of speed and distance which are not susceptible of such exactness. *Charlton Bros. Transp. Co. v. Garrettson,* 188 Md. 85, 51 A. 2d 642, 645. In the instant case some distances were measured wth exactness which cannot be controverted by loose estimates, and the testimony (notwithstanding vague doubts suggested by some of the witnesses) leaves no substantial question as to the photographs. *Baltimore & O. R. Co. v. Bruchy, supra,* 161 Md. at page 177, 155 A. at page 347. The range of possible differences in other testimony as to speed and distances is not large enough to make the impossible possible.

Our conclusion on the question of contributory negligence makes it unnecessary to consider any other questions, including the question whether the testimony of witnesses who heard no whistle would be sufficient to controvert the testimony of the trainmen and disinterested passengers that the whistle was blown and the testimony as to the regular routine regarding the whistle. *Cf. Gosnell v. Baltimore & O. R. Co.,* 189 Md. 677, 57 A. 2d 322.

*Judgment reversed, with costs, without a new trial.*

COLLINS, J., filed the following dissenting opinion.

It is well settled that in no case ought the Court to take the question of negligence from the jury unless the conduct of the plaintiff relied upon as amounting to contributory negligence is established by clear and uncontradicted evidence, and, when the nature of the act relied on to establish contributory negligence can only be determined by considering all the circumstances attending the transaction, it is within the province of the jury to pass upon and characterize it, and it is not for the Court to determine its quality as a matter of law. *Washington R. R. Co. v. Sullivan,* 136 Md. 202, 110 A. 478; *Krause v. Baltimore & O. R. Co.,* 183 Md. 664, 673, 39 A. 2d 795. The Court must assume the truth of plaintiff's evidence although it may have been contradicted in every detail.

In the case before us there is no dispute that the warning bell at the crossing was not working at the time that Andrews was killed by the train, and that it had been out of order for two days prior to that time. Andrews was familiar with the road, although he did not use it frequently. There is no evidence to show that he had any knowledge that the warning bell was out of order when he attempted to cross the track. McGaney, an inmate of the Maryland Reformatory for Males, testified he was twenty-five feet from the crossing at the time of the accident and Andrews stopped about ten feet from the east rail of the track and for about five seconds looked up and down the track before attempting to cross. There was other testimony that at ten feet from the track one could not see up the track approximately fifty feet and at twenty feet one could not see up the track at all and at that distance one is back of the hedge. A witness, who lived at the crossing, testified that at fifteen feet from the track a train could not be seen more than seventy-five feet from the crossing. Of course, the weight of the evidence is a question for the jury and not a question for the trial judge or for this Court on appeal. This evidence supports the con-

tention that Andrews stopped, looked, and listened and, seeing no train and hearing no bell, he attempted to cross the track believing it was safe for him to do so. It also supports the contention that Andrews relied on the silence of the bell before moving into a position of danger after he stopped. The law as stated in the case of *Baltimore & O. R. v. Windsor,* 146 Md. 429, 438, 126, A. 119, 122, and quoted in the majority opinion, that "the degree of care, required of one approaching a crossing, when an automatic bell of which he has knowledge is silent, is only that which an ordinarily prudent man would use under such circumstances, and not the extreme care that would be required if there were no device there to indicate safety; and that whether proper care has been exercised under *such circumstances* is ordinarily a jury question", is applicable here. I think that Judge Mish was clearly correct in refusing to rule that Andrews was guilty of contributory negilgence as a matter of law. See also *Caryl v. Baltimore Transit Co.,* 190 Md. 162, 58 A. 2d 239. The evidence in the case at bar in my opinion is clearly distinguishable from that in *Baltimore & O. R. Co. v. Bruchy,* 161 Md. 175, 155 A. 346, relied on in the majority opinion.