WESTERN MARYLAND RY. CO. *v.* DAVIDSON
[No. 63, October Term. 1948.]

*Decided January 14, 1949.*

120

*Rehearing denied February 9, 1949.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, HENDERSON and EMORY H. NILES of the Supreme Bench of Baltimore City, specially assigned, JJ.

*Walter C. Capper* and *Paul S. Parsons* for the appellant.

*Thomas L. Richards* and *William H. Geppert* for the appellee.

MARBURY, C. J., delivered the opinion of the Court.

At about 6:30 in the morning on October 20, 1946, Charles Edward Davidson, the appellee, was driving his automobile in a general northerly direction on Virginia Avenue in Cumberland, approaching the railroad crossing of the appellant. It was Sunday morning and Mr. Davidson had driven to the residence of a Miss Shade at 42 Roberts Street for the purpose of taking her to work. Roberts Street is roughly parallel to the tracks of the appellant, and intersects Virginia Avenue about 132½ feet south of these tracks. Miss Shade was not going to work, so appellee started back to his home. He testified that at that time it was not quite daylight, and there was a fog which was so dense that it was practically dark. He had his headlights on and could see in

front of him, at the most, two car lengths, or the length of two automobiles. Virginia Avenue, according to his testimony, is an upgrade from Roberts Street to the railroad tracks. The appellee was driving a 1939 Pontiac four-door sedan which was in excellent shape, and was equipped with windshield wipers, heater, and a defroster. On this morning the two side ventilator windows were folded out at about a 40° angle, according to appellee's testimony, so as not to let in the rain. He stated it was raining fairly hard. When he turned the corner from Roberts Street into Virginia Avenue, he said he automatically went into second gear which he had to do because there is a steep incline there to the railroad tracks. He went up about 15 miles an hour, and stopped the car about twelve feet from the crossing, that is, from the first rail. He said he then looked up and down the track and saw nothing. He pulled his car into low gear and proceeded to cross the crossing. He said there was no whistle blown, there was no bell rung, and when he reached the crossing he was hit by a westbound freight train which struck his car directly in the middle between the two doors. He said there was no watchman there and no automatic signals, and there were no warning lights or flashing lights.

Appellee had been taking Miss Shade to work on Sunday mornings for three or four months prior to this time, and, for this period at least, he had been crossing and recrossing this particular crossing. He said that he had been over it four or five times a week, that he was familiar with it, and that he knew that both freight and passenger trains ran on the tracks, sometimes at a speed of 30 to 35 miles an hour. He had only his small ventilator windows open, but had the other windows up, and he said he could not hear as well that way as if he had had the larger windows open. In addition his motor was running and he states in his brief that his two windshield wipers were running. This seems a probable deduction from the circumstances, although it does not appear in the testimony.

The appellee sued the railway company, and after testimony had been completed, the defendant offered a prayer to take the case from the jury because, under the uncontradicted evidence, the plaintiff, by his own negligence directly contributed to the happening of the accident. The court refused this prayer and a verdict was obtained against the railway. Thereafter the railway made a motion for a judgment *n. o. v.* and this was refused by a divided court, whereupon the railway company appealed here. The sole question in controversy is whether the appellee was guilty of contributory negligence as a matter of law. No question is raised. as to the primary negligence of the appellant.

In addition to the evidence of the appellee himself which we have outlined above, the appellee produced four other witnesses whose testimony is important in connection with this question. One of these is Miss Shade, the back of whose house was 53 feet from the railroad track. After she had told Mr. Davidson that she was not going to work that morning, she went back upstairs and was going to bed. She looked out of the window of her room and saw, going past, the train which subsequently struck Mr. Davidson. She heard the crash, looked out of the window to see what had happened and saw that the cars outside of the window were unhooked. She also stated that the train was going downhill and was drifting and did not make as much noise as a train does when it goes the other way. Another witness produced on behalf of the appellee was Otis McKee, Miss Shade's father. He said that on the morning in question he was out in his backyard at 42 Roberts Street, about 40 or 45 feet from the train. He saw the train go by. Another witness for the appellee, a Mr. Crites, lives at the corner of Roberts Street and Virginia Avenue. He was sitting in his automobile on Roberts Street waiting for a friend. It was foggy and raining hard, just breaking daylight, and visibility was poor. He heard the train and saw people running up to where the train had stopped. He then went there himself, and saw Mr. Davidson in the auto-

mobile after the accident. The automobile at that time was 401 feet from the crossing. It stopped directly opposite 25 West Roberts Street. Another witness named Knisley lived at 25 West Roberts Street and was on his front porch when he heard the crash. He saw the train going up the track and saw the automobile fall off the train directly in front of his house. He said he could see the Virginia Avenue crossing from his house, although it was raining hard, was foggy, and visibility was very poor, and the street lights were still on. He had lived in that neighborhood ten years and was familiar with the crossing.

The case can be considered in two aspects. One is that presented by the testimony of the appellee who gave the only testimony as to his own actions before the collision occurred. The other is that presented by the testimony of his witnesses above referred to. If we consider the case from the standpoint of the appellee's testimony only, we have a situation where the driver of an automobile goes up a grade which he testifies is so steep that, to climb it, he has to put his car into second gear. When he gets twelve feet from the railroad track, along which he knows trains are frequently passing, he stops and remains stopped for thirty seconds, and he hears nothing. In this situation, where he is about to go into a position fraught with danger, he does not even lower his side windows so that he can hear whether a train is approaching. His motor is still running, and if his windshield wipers are operating, as seems natural, he does not turn them off. In fact, he does nothing to enable him to hear more clearly. He could see only two automobile lengths in front of him, and, presumably, that would also apply to each side. Under these circumstances, hearing nothing and admitting that he was not able to see anything, he deliberately drives upon the track and is hit. There is no question, if we accept his testimony, that he is guilty of negligence directly contributing to the accident.

On the other hand, if we accept the testimony of his witnesses, there was much greater visibility than he

states.  Miss Shade and her father saw the train in the rear of their house, some 50-odd feet away, and the witness Knisley, on the other side of Roberts Street, saw the automobile separate from the engine after it had been carried approximately 400 feet from the crossing.  He was about 175 feet in a direct line from the point where the automobile rested after the accident.  If we believe these witnesses, then there was enough visibility for the appellee to see the train approaching when he was 12 feet from the track.  About 551 feet away from the crossing, in the direction in which the train was approaching, the track commences to curve, but there is nothing in the record to show that there were any obstructions to appellee's vision to this point.  When he says that he looked in both directions, and saw nothing, and when it is apparent that the train was so close to him that it struck the middle of his car as soon as he got on the track, and it therefore must have been seen by any one looking from the position in which he says his car was stopped, we can only conclude, if we believe the appellee's witnesses as to the visibility, that his own testimony belongs in that class to which we have many times referred as being unworthy of belief or consideration.  *Maryland Electric Railway Co. v. Beasly,* 117 Md. 270, 83 A. 157; *Evans v. Baltimore, C. & A. Railway Co.,* 133 Md. 31, 104 A. 112; *Baltimore & O. R. Co. v. Bruchy,* 161 Md. 175, 155 A. 346.

The appellee contends that this case bears a close resemblance to the case of *Krause v. Baltimore & O. R. R. Co.,* 183 Md. 664, 39 A. 2d 795, in which we found that the question of contributory negligence was properly submitted to the jury, and reversed a judgment *n. o. v.* In that case, the plaintiff was struck by a Diesel engine at a railroad crossing in the city of Baltimore, shortly after 6 o'clock in the morning.  The crossing consisted of four tracks.  The plaintiff was familiar with them, and there were no obstructions to prevent his view.  The weather was cloudy and a little foggy.  Plaintiff had crossed the first three tracks in safety, when, in the mat-

ter of seconds, a dark object approached on his left and collided with his automobile. His windows were closed, except a ventilator window, just as in the case at bar, and his headlights were burning. He was going faster than the appellee in the case at bar, and had slowed down about 50 feet from the first track to about 10 miles an hour, and looked and listened to his right and left. There was evidence that there were no lights of any kind on the Diesel engine, and that it moved noiselessly. We said the situation was different in that respect from an approaching engine and cars which necessarily make considerable noise. The railroad contested the plaintiff's testimony that there was no headlight on the engine. In that case, in view of the fact that there was positive testimony that there were no lights on the Diesel engine, and that no horn or whistle was blown, we said that we could not say that the plaintiff's testimony that he did not see or hear the approaching engine was unworthy of belief, and for that reason, although the distinction was a narrow one, we thought the case was proper for the consideration of the jury.

In the case before us there is no evidence that the train was proceeding silently, although one witness does say that trains made less noise going in the direction in which this train was going, which was down grade, than in the opposite direction. This was a long freight train, consisting of an engine, 107 cars and a caboose. There was no testimony that there was no light upon the train, although there is testimony that no whistle was blown or bell was ringing. A traveler approaching a railroad crossing must look, listen, and stop if necessary, and, even if a bell, which ordinarily rings on the approach of a train is silent, that does not excuse the traveler from this imperative duty. *Baltimore & O. R. Co. v. Bruchy, supra; Baltimore & O. R. Co. v. State, for Use of Andrews,* 190 Md. 227, 58 A. 2d 243. If appellee found conditions as he states they were, then his actions in proceeding when he could not have seen a train, even if he had looked, were highly imprudent and constituted negilgence on his

part. He was not struck by a silent engine moving without lights. He was confronted by a situation where he did not lower his windows and turn off his motor so as to get the maximum opportunity for hearing an approaching train, and where he says he could not see more than two automobile lengths in front of him. In such a situation he was clearly obliged to do more than he did, and his failure to act as a prudent man would, contributed to the accident. On the other hand, as we have said, if we accept the testimony of his witnesses that the train could be seen, then his statement that he looked and did not see cannot be accepted.

Both the appellant and the appellee cited in their briefs, and in their argument, other cases from this state, and from other states, which bear upon these questions. There are many other cases not cited which also have bearing, but there is no necessity for prolonging this opinion by discussing them or distinguishing them, if they are distinguishable. Each case is somewhat different, and the court must decide each case upon the facts there presented, applying to these facts the well-established principles of law with respect to railroad accidents at grade crossings. It is regrettable that such accidents happen, but merely because a traveler is injured, does not justify the courts in permitting a jury to give him damages against a railway company. He must be free from blame himself before he can recover because of the negligence of the railway. Since we find that the appellee's negligence in this case did contribute to his accident, the appellant's prayer should have been granted, or his motion for judgment *n. o. v.* should not have been denied.

*Judgment reversed with costs, without a new trial.*