## PATAPSCO & BACK RIVERS RAILROAD COMPANY ET AL. *v.* BOWERS

[No. 120, October Term, 1956.]

80

*Decided March 15, 1957.*

*Motion for rehearing filed March 23, 1957, denied April 12, 1957.*

The cause was argued before BRUNE, C. J., and COLLINS, HENDERSON, HAMMOND and PRESCOTT, JJ.

*Michael P. Crocker* and *Franklin G. Allen,* with whom were *Piper & Marbury* on the brief, for the appellants.

*George L. Clarke* and *Everett L. Buckmaster,* with whom were *George W. White, Jr., Joseph Leiter* and *Buckmaster, White, Mindel & Clarke* on the brief, for the appellee.

HAMMOND, J., delivered the opinion of the Court.

A tractor-trailer and a diesel locomotive tried to occupy the same space at the same time at a crossing on land of the Bethlehem Steel Company. A jury awarded Bowers, the driver of the tractor-trailer substantial damages. The railroad and the locomotive engineer appeal from the judgment that followed, urging upon us with earnestness and vigor that there was no primary negligence, that Bowers was contributorily negligent as a matter of law and that the trial court erred in refusing to charge that due care required Bowers to stop, look and listen and the verdict must be against him, if it found that his failure to do so was a proximate cause of the collision.

About ten o'clock in the morning of a clear January day,

Bowers was driving the tractor-trailer, loaded with nineteen tons of steel coils, east on a two lane blacktop private road that runs behind the strip mills of the Bethlehem Steel Company at Sparrows Point. At the place of the accident, the Patapsco & Back Rivers Railroad has three tracks running north and south, curving to the east as they cross the road. The westernmost and easternmost tracks are about one hundred sixty feet apart. Just west of the westernmost track there is a stop, look and listen sign. When Bowers came to this sign, he made a full stop and looked right and left. There was nothing on the first and second tracks but on the third he saw a diesel locomotive to the south, to his right, about seventy-five feet from the crossing, standing still with some of the crew standing around it. Bowers then started up the tractor-trailer. He attained a speed of eight or ten miles an hour between the tracks, but took his foot off the gas and slowed down to about five miles an hour as he crossed the second track, and again as he crossed the third track because he was afraid the tons of coiled steel would bounce and break the springs if he went faster. At the second, or middle track, when he was approximately seventy-five feet from the third track, Bowers looked again to the right and left and saw the rear of the diesel locomotive, still motionless where he had first seen it. A large mobile crane, standing between the middle and third tracks six or seven feet to the right or south side of the road, blocked out the rest of the locomotive at that point and thereafter all of it until Bowers was some twenty-five or thirty-five feet from the third track. After he saw the locomotive for the second time, Bowers continued on towards the third track but did not thereafter look to his right. His explanation for not doing so was this; having seen the diesel standing still with the men around it on the ground, when he was at the first track, and again having seen it still motionless when he was at the second track, he thought it was not going to move across the road and his belief was reinforced by the fact that there was no watchman to flag down vehicular traffic. The testimony of the engineer was that the "usual procedure" was for a brakeman to guard the crossing when trains were about to cross it. Bowers had

driven over these tracks several times a week for over a year and said that when an engine or a train was to cross the road, a brakeman always warned automobiles and trucks. Seeing no flagman on the occasion in question, he "figured the engine was going to stay there, it wasn't coming out of the yard." Bowers says, too, that for the last twenty-five or thirty feet before he reached the third track, his attention was engaged by a red tractor-trailer approaching in the opposite direction around the curve on the narrow roadway. He testified that the window of the truck cab was open and that he heard no horn or whistle, although he could have heard them if they had been sounded. When the tractor and some six to eight feet of the trailer had crossed the third track, the trailer was struck by the diesel locomotive going downgrade about eight or ten miles an hour. The engine cut almost through the trailer and drove it across the road to the north side.

The railroad's operating rules, offered in evidence, require a man to ride on the front end of a locomotive whenever shifting operations, such as were taking place at the time of the accident, were going on.

We think there was evidence of primary negligence to go to the jury. The engineer testified that if the rule of the railroad as to the lookout on the leading end of the locomotive had been obeyed, the accident would not have happened. Too, it has been held in a number of cases that where a railroad customarily gives warning of the passage of trains over a crossing, its failure to do so on a given occasion is evidence of negligence. *Pennsylvania R. R. Co. v. Brewer,* 188 Md. 646, and cases cited.

The answer to whether Bowers was contributorily negligent as a matter of law turns on whether his failure to look to see whether the locomotive had started up, after leaving the second track, was such a clear violation of duty, under the circumstances, that the minds of reasonable men would not differ as to the answer. This Court has four times decided that an implied invitation arises from the failure of a railroad to warn of the approach of a train at a crossing, where it customarily gives such a warning and that such an assur-

ance of safety lowers the standard of care ordinarily required of a motorist at a crossing and has an important bearing upon whether or not, under the circumstances, due care was used by the injured plaintiff. *Baltimore & Ohio R. Co. v. Stumpf,* 97 Md. 78; *Pennsylvania Railroad Co. v. Hurst,* 135 Md. 496; *Baltimore & Ohio R. Co. v. Windsor,* 146 Md. 429; *Pachmayr v. Baltimore & Ohio R. Co.,* 157 Md. 256. The appellants urge upon us that later cases in effect have over-ruled the holdings of the four cases relied on by the appellees, although not doing so in terms, and if they have not, have reiterated that reliance on the lack of customary warning can never be a complete substitute for the inflexible legal obligation of looking and listening until the point of danger is passed.

In the *Stumpf* case there were four tracks all protected by one crossing gate as the Baltimore City ordinance required. The view was obstructed by cars on the nearest track. The plaintiff looked and listened and, perceiving no sign of an approaching train, drove onto the tracks without stopping because the gate was up. While crossing the second track, he was struck by an express train. It was held that the failure of the railroad to have the crossing gate down was evidence of want of ordinary care if the injury could have been avoided if the gate had been down. In deciding that the injured man was not guilty of contributory negligence as a matter of law, the Court relied on a number of English and American cases. Quoted was the holding of a New York case that where a traveler goes upon the tracks under the implied invitation of lack of customary warning, "* * * it is for the jury to say whether the traveler exercised that ordinary care and prudence which under the circumstances it would be natural to expect." The holding of *Stumpf* was that failure to stop was not, under the circumstances, negligence as a matter of law as it would have been but for the open gate.

The *Hurst* case again presented a situation in which the crossing gates were not lowered. The Court said that except for the failure of the safety gates, plaintiff could not have recovered because he did not stop when, by doing so, he could

have seen or heard the approaching train, but that under the circumstances it was for the jury to decide whether the failure to stop was negligence. The Court read the *Stumpf* case as holding that open gates are "* * * a substantial assurance of safety" and that where the gates are open, "* * * it is not the duty of a traveller to stop, except when danger in crossing is apparent notwithstanding the open gate", and concluded that "* * * except where the traveller attempts to cross in the face of obvious danger, if he be injured while crossing through an open gate, the question whether he was guilty of contributory negligence is for the jury."

The *Windsor* case was one where a customary automatic warning bell was not working at the time of the accident. The driver pulled up at the crossing, stopped, listened for the bell which he did not hear, and looked for the train which he did not see or hear apparently because of obstructions. The Court said that there was directly presented the question of whether the rule that where there is no customary warning, it is a duty of one at a railroad crossing to continue to look and listen until he has passed the point of danger or be charged with contributory negligence, is to be "strictly applied in *all* cases, even where the failure of an automatic crossing bell to ring may have induced the traveller to exercise something less than the extreme care required in ordinary cases?". The Court again referred to the *Stumpf* case, saying that there "* * * it was a question of failure to *stop*, and not of failure to *look* and *listen*", but that it is impossible to read the case and consider the authorities therein cited and quoted without realizing that "its reasoning is in harmony with the conclusion we have reached, that under the facts of the present case the question of contributory negligence could not properly have been determined as a matter of law." The Court emphasized the fact that its decision was not the equivalent of deciding that in every case, in which there is evidence of lack of customary warning, the question of contributory negligence must go to the jury, but added that to hold that in *no* case should the failure of the customary warning be given weight in determining the presence or absence of contributory negligence, "* * * would be not only against the weight of

authority but against reason, in view of the well established rule that in considering the question of contributory negligence the conduct of the plaintiff must be taken in connection with all the surrounding circumstances."

The *Pachmayr* decision was one in which a railroad conductor, while driving a truck, was struck at a crossing at which he often worked for the railroad, by an engine running backwards. It was the railroad's custom to stop engines before sending them over the crossing and to post a flagman to warn traffic whenever a crossing was to be made. When Pachmayr was ten or twelve feet from the tracks, he slowed down, noticed the engine backing, and then went on, and was hit and killed. Judge Urner, speaking for the Court, said that before the victim could be judicially declared to have been contributorily negligent, due consideration must be given not only to all inferences of fact tending to support the opposite view, "but also to the important presumption that he exercised ordinary care for his own safety. * * * It does not appear that he drove on the track without looking for dangers which might be imminent, and that he thus acted in heedless and complete reliance upon the assumption that the practice of posting flagmen for passing trains or locomotives would in no instance fail to be pursued. * * * This case is an appropriate one for the application of the principle that, while a traveller on a highway is not relieved of the duty of exercising care at a railroad crossing because the danger signals usually employed there, to his knowledge, are not at the time displayed, yet the implied assurance of safety from the absence of the customary warning is a circumstance materially affecting the question whether the proper degree of care was exercised." Contributory negligence was held to be for the jury, essentially because of the lack of warning plus a right to assume the engine would stop before crossing as it usually did.

The reliance of the appellants is upon *Pennsylvania R. Co. v. Yingling,* 148 Md. 169; *Baltimore & Ohio R. Co. v. Bruchy,* 161 Md. 175; *Baltimore & Ohio R. Co. v. Andrews,* 190 Md. 227; and *Western Md. Ry. Co. v. Davidson,* 192 Md. 119. In the *Yingling* case the railroad had for some period of time

furnished watchmen from six o'clock in the morning until six o'clock in the evening. On June 25, they discontinued the watchman from 3:30 P. M. to 6:00 P. M. The plaintiff in that case drove over the crossing in question three or more times a day. The accident occurred on July 14. The Court concluded that he must have found out in the course of the fifty or more times that he drove over the crossing from June 25 to July 14 that there was no watchman on duty after 3:30 P. M. and that, therefore, no implied invitation to cross or assurance of safety arose in the absence of a watchman in the late afternoon.

In the *Bruchy* case, the opinion was written by Judge Adkins, who had written the opinion in the *Hurst* and *Windsor* cases. There, as in the *Windsor* case, the crossing bell did not ring. The testimony was that if he had looked as he said he did, the plaintiff could have seen the train ninety-eight feet from the crossing, before a mill obstructed his view, and must have seen it in full view when he was fifteen feet from the crossing. The Court held that the silence of the bell "made no difference" and could not be controlling in the case because the only purpose of the bell was to give warning and the injured man says he did all that he would have done if he had heard the bell. It found, however, that his testimony that he continued to look up to the moment of crossing the tracks and did not see the train could not be believed, because he would not be heard to say this when he must have seen it if he had looked. The Court said that there is a difference, at least in the degree of negligence, between proceeding across the tracks without continuing to look, after having stopped and carefully looked—as in the *Windsor* case—and the crossing from a place of absolute safety without troubling to look and listen at a point where the train could plainly be seen, as in the case there being discussed. The Court said that the plaintiff Windsor relied on the silence of the crossing bell and the point was (1) that he stopped at the crossing to look and listen, and (2) he did not continue to look and listen because he did rely on the silence of the bell. The *Pachmayr* case was distinguished as being different on the facts.

The *Andrews* case was decided by a divided Court. An-

drews was killed by the train. The customary warning bell did not ring. A witness for his side of the case testified that Andrews looked for the train when he was ten feet from the track. The Court recognized the rule that credibility of conflicting evidence is for the jury but said that if "* * * a witness says he looked and did not see, when if he had looked he must have seen, such testimony is unworthy of consideration. * * * This is no less true of testimony that someone else looked and did not see." The Court's analysis of the testimony was that the difference in the versions of the plaintiff and the defendant was "* * * only the difference between attempting to cross, after stopping, without looking and attempting to cross without stopping or looking", and said that either version showed that the unfortunate Andrews "* * * used no care at all * * * and leaves no jury question as to what care an ordinarily prudent man would use under the circumstances." The Court quoted that part of the *Windsor* opinion that held: "* * * the degree of care, required of one approaching a crossing, when an automatic bell of which he has knowledge is silent, is only that which an ordinarily prudent man would use under *such circumstances,* and not the extreme care that would be required if there were no device there to indicate safety; and that whether proper care has been exercised under *such circumstances* is ordinarily a jury question" and then referred to the suggestion in the *Bruchy* opinion to the effect that the *Windsor* decision was limited to its facts and held that the case being considered was controlled by *Bruchy,* not *Windsor.*

In the *Davidson* case, there was no testimony seeking to show reliance on any customary warning and no implied invitation whatever was involved. Therefore the language of the Court looked to by the appellants, that complete reliance cannot be placed on a silent bell to the exclusion of other precautions, would seem to have been an oversimplified dictum.

We do not find the four cases relied on by the appellees to have been overruled or that their effect, as to cases having analogous facts, to have been substantially impaired by later decisions of this Court. One or more of the *Stumpf, Hurst, Windsor* and *Pachmayr* cases have frequently been cited. See,

for example, *Pennsylvania R. R. Co. v. Brewer,* 188 Md. 646, 654, *supra,* where *Windsor* and *Pachmayr* are cited to support the statement that "Knowledge or lack of knowledge of a custom to warn * * * has an important bearing upon the question of the exercise of care by the plaintiff * * *." As the cases in question, and many others, have noted, the matter must ultimately depend in each instance on the facts of the case. The *Davidson* case, for example, says this at page 126 of 192 Md. The essential holding of each of the cases relied on by the appellants is that the implied invitation from lack of customary warning was not relied on essentially by the injured or killed motorist who, in each case, was held, despite testimony to the contrary, not to have looked at all or to have recklessly gone across the track without reliance on the lack of warning and without regard to his own safety. In the cases looked to by the appellees, the testimony showed reliance on the lack of warning and the test applied was whether failure to stop or look or listen on the faith of the sense of security garnered from that lack, could reasonably be justified under all of the circumstances. In deciding the case before us, we apply the familiar rule that "The question of contributory negligence must be considered in the light of all the inferences favorable to the plaintiff's case that may be fairly deduced from the evidence." *Baltimore Transit Co. v. Castranda,* 194 Md. 421, 434.

Bowers' testimony was that not only was he reassured by the absence of any watchman or flagman, but that this implied invitation to a safe crossing, together with the view he had of the stationary diesel locomotive, with its crew standing on the ground, seen one hundred sixty feet from the third track and the second view of the diesel, still motionless, when he was seventy feet from the third track, combined to make him believe that there was no need to look further. We cannot say that reasonable minds would unite in deciding that failure to look during the passage of the last twenty-five to thirty-five feet, under such circumstances, was imprudent or the act of a man disregarding his own safety. As has been noted in various other cases, it is against all human experience to reckon that an ordinarily prudent man would not be influenced by the substantial assurance of safety given by the absence of

the customary warning usually relied on. Here there was not only that reliance but the further assurance given by the motionless diesel. We think the question of contributory negligence properly went to the jury.

We find no merit in the appellants' claim that the court's charge incorrectly stated the law. If, on the facts and circumstances of the particular case, it be held correctly by the trial court that the case is to go to the jury because the standard of care required of the motorist crossing the railroad tracks properly was lessened by the absence of the customary warning, then to instruct the jury that if the motorist failed to stop or look or listen, as the case may be, he must lose his case, would be a contradiction in terms for it would be the equivalent of directing a verdict for the defendant. Where the facts and circumstances are such that the case is not to be taken from the jury, such an instruction need not be given. This was explicitly held in the *Stumpf* case, at page 93 of 97 Md., and in the *Windsor* case, at pages 436 and 440 of 146 Md. See also *Baltimore Transit Co. v. Castranda, supra,* at page 435 of 194 Md., and *Baltimore & Ohio R. R. v. Corbin,* 118 F. 2d 9, at pages 10 and 11, and cases cited. The Court instructed the jury that if "any" negligence on Bowers' part contributed to the accident, he could not recover, that such negligence meant failure to exercise "such care and caution as a reasonably prudent person would have exercised under like or similar circumstances"; that Bowers had to use due care to guard against the danger of oncoming trains and that if he approached the tracks without so doing and that this contributed to the collision, the jury had to find for the defendants; that a train has a "paramount right over motor vehicles" at an intersection and that the operators of the train had the right to assume that a motor vehicle approaching the intersection of a road and a railroad will "stop and grant the train the right to proceed"; and finally that if Bowers knew and relied upon the absence of the customary flagman, that fact "lessened the plaintiff's otherwise obligation to have discovered in time the approaching train" and that fact could be considered along with the other evidence in determining whether Bowers was contributorily negligent.

90

We think the trial court's charge was adequate under the circumstances of the case.

*Judgment affirmed, with costs.*

HENDERSON and PRESCOTT, JJ., dissent.