## THE BALTIMORE AND OHIO RAILROAD COMPANY *v.* PLEWS ET AL.

[No. 427, September Term, 1970.]

*Decided June 4, 1971.*

444

The cause was argued before MCWILLIAMS, FINAN, SMITH and DIGGES, JJ., and JERROLD V. POWERS, Associate Judge of the Court of Special Appeals, specially assigned.

*H. Russell Smouse* and *Thomas L. Samuel,* with whom were *Thomas C. Beach, III,* and *Clapp, Somerville, Black & Honemann* on the brief, for appellant.

*George W. McManus, Jr.,* and *Melvin J. Sykes* for appellees.

SMITH, J., delivered the opinion of the Court.

A runaway B & O Railroad locomotive struck and killed Albert Plews (Plews) at a street crossing in the

Curtis Bay area of Baltimore City on March 25, 1969, at approximately 2:00 p.m., thereby giving rise to this litigation.

Appellant, The Baltimore and Ohio Railroad Company (B & O), appeals judgments totaling $200,000.00 entered against it as a result of that accident. Suit was brought by appellee Catherine E. Plews as surviving widow and also as administratrix. Suits were also brought on behalf of the infant children. We shall affirm the judgments.

The questions presented to us are seven in number, namely: (1) whether there was sufficient evidence as a matter of law to support a finding of primary negligence; (2) whether Plews was guilty of contributory negligence as a matter of law; (3) whether the trial judge committed prejudicial error in his charge to the jury; (4) whether the opening statement for the plaintiffs-appellees was "so improper and prejudicial to the defendant-appellant that a mistrial should have been granted"; (5) whether "the closing argument by the plaintiffs-appellees [was] so improper, inflammatory, and prejudicial to the defendant-appellant that the verdict should be set aside"; (6) whether the trial court can properly allow "testimony with regard to damages as to matters not of a compensable nature and [whether] the response to an improper question [was] inflammatory and prejudicial to defendant-appellant"; and (7) whether there was sufficient foundation laid for the damages projection given by an expert and whether his opinion as to damages was properly admitted in evidence.

B & O's diesel locomotive D-9719 was on a "fire track" [1] at its Curtis Bay yard at approximately 8:30 a.m. on the day of accident. Certain of B & O's employees observed it at various times up to and including 1:15 p.m. on that date. An employee testified that at that time he looked at the isolation switch, saw that it was off, saw that the

1. This is said to be a railroad term dating from the days of steam locomotives. In its current context it is said to connote a yard track where engines are serviced with fuel, sand, and water.

engine run button was off, and saw that the hand brake was on. B & O, pursuant to a demand for admission of relevant facts, admitted that when engines are left on the fire track for service or storage it is customary to leave their motors idling. It further admitted that the motor of this particular engine had been idling for several hours prior to this unfortunate incident. B & O's general locomotive foreman testified that this was done for reasons of economy.

If the engine run button is in an "off" position and the isolation switch is in "isolate" or "off" position, there is no power for the engine to move from one position to another even though the throttle is moved into a forward position or opened wide. Likewise, if the isolation switch is in an "off" position and the engine run button is in an "on" position, there is no power and the engine cannot move from one position to another even though the throttle is moved. This also was established by a demand for admission of relevant facts. The parties made commendable use of this discovery tool.

It is conceded that two teenagers who had "hooked school" climbed up into the engine cab "to get some flares and some gloves and stuff". By their story, one of the boys "fell back against something and the engine started roaring up". They then jumped off, leaving the area. They expressly denied turning on any buttons or switches.

The engine moved out, unattended. It was observed by certain of B & O's employees who made efforts to protect the Pennington Avenue crossing. The assistant terminal trainmaster ultimately boarded and stopped the locomotive after the collision in question had taken place. He then observed that the wheels of the engine were what he called "blue hot", hotter than "the red stage". He noted that the independent brake was then on and drew the inference that the "blue hot" situation was brought about by the pressure of the brake shoes. He also noticed that the engine run switch was on, that the isolation

switch was in the "run" position, and that the throttle was in full forward position.

Pennington Avenue at its point of intersection with the B & O track is a four lane highway. It runs almost due north and south. The railroad tracks run in a generally east-west direction. A tank truck driver just prior to the accident was proceeding northerly on Pennington Avenue in the right-hand or slow lane. Approximately 300 feet prior to reaching the crossing he put on his four-way flash signals to indicate that he would stop at the railroad crossing as he was required to do with his type of cargo. At that point he noted the Plews vehicle begin to move out into the left-hand lane to pass him. The truck driver estimated the speed of his own vehicle immediately prior to slowing down at 30 miles per hour. The Plews vehicle gradually passed the truck. The passing was complete when the truck fully stopped some 40 feet from the nearest of the two sets of tracks. This point was approximately 50 feet from the second track. In response to a question relative to the speed of the Plews vehicle the witness said:

> "I don't know whether he increased or decreased his speed. I can't tell you that because I wasn't watching him continuously. I was bringing my vehicle under control. I only periodically glanced—I did make mental notations as to what was going on. I know that he was and did pass me. Whether he increased or decreased, I do not know."

He heard no brakes being applied. Weather conditions were clear and dry. The collision between Plews' pickup truck and the locomotive occurred at the second of the two tracks. Plews at that time was pulling back into the right lane. As the truck driver put it:

> "It was directly in front of me, but it was coming to the right lane again and the only part of him that I can recall in the right lane was the

> right front wheel and fender, and he was hit at the right front door. There is only one door in a pickup truck on the right side."

There were no other eye witnesses produced.

B & O presented evidence indicating that at a point 40 feet south from the south rail of the south track (the track nearest Plews) along the east curb of Pennington Avenue there was clear and unobstructed vision of 925 feet in the direction from which the locomotive came.

The fire track was located between Benjamin Franklin Junior High School and the Fairfield Apartments. Youngsters and adults had been observed going back and forth over these tracks between the school and the apartment house. Some of them had from time to time been seen in the cabs of locomotives and had been admonished by employees of B & O to leave the area. Prior to the date in question some of these young people had been observed taking gloves and flares from the cabs of locomotives.

It was established that the locomotive had locks built into the doors and latches on the windows, both of which could be locked, but which were not. It was further established that the service track on which the engine was sitting did not have a derailing device on it and that switches could have been set so that if the locomotive went into motion it would have ended up within the railroad yard rather than at the Pennington Avenue crossing.

B & O's regulations required a locomotive left with engine running to have its independent brake "fully applied" and, if not left in the charge of a hostler or shop forces, to have the hand brake also applied. There was no hostler on duty in the Curtis Bay yard on the day of the accident.

B & O's regulations required trains and engines at the Pennington Avenue crossing to stop before moving over the highway. They further required that a member of the crew dismount from the train and stop traffic by

use of a red flag by day, red lantern at night, before giving a signal for a train or engine to proceed across Pennington Avenue. They also specified that locomotives should sound their bell and horn, which, of course, was not done in this case. It was established through the testimony of an individual who had gone back and forth across the Pennington Avenue crossing with Plews many times at least since 1964 that Plews was acquainted with the fact that a member of the train crew stopped traffic before a train or engine crossed Pennington Avenue.

Speed of the locomotive at the time of the impact was not established. The truck driver said, "It was travelling fast. That is all I can say." A B & O drawbridge operator estimated its speed at approximately 30 miles per hour when it crossed the drawbridge over Curtis Creek, about 1.7 miles beyond the Pennington Avenue crossing.

## PRIMARY NEGLIGENCE

In considering liability we start with the fact that in determining whether a defendant's demurrer prayer or motion for judgment *n.o.v.* should be granted the court is obliged to resolve all conflicts in the evidence in favor of the plaintiff and to assume the truth of all evidence and such inferences as may naturally and legitimately be deduced therefrom which tend to support the plaintiff's right to recovery. *Beck v. Baltimore Transit Co.,* 190 Md. 506, 509, 58 A. 2d 909 (1948), and cases there cited.

B & O correctly cites *Wash. Sub. San. Comm. v. Musgrove,* 203 Md. 231, 238, 100 A. 2d 27 (1953), for the proposition that in an action to recover damages for injuries caused by the alleged negligence of the defendant, the burden of proof is on the plaintiff to prove that there was a neglect of duty by the defendant and that the injuries sustained were the direct consequence of such neglect of duty. It quotes the opinion of Judge (later Chief Judge) Prescott in *Aleshire v. State,* 225 Md. 355, 170 A. 2d 758 (1961), where he said for the Court:

"Of course, the test of foreseeability, or rea-

sonable anticipation as it is sometimes called, must be judged by foresight, not in retrospect. The wrongfullness, *vel non*, of a person's conduct must be evaluated in the light of the risks apparent to him at the time, and not by looking backward 'with the wisdom born of the event.' Cardozo, C. J., in *Greene v. Sibley, Lindsay & Curr Co.*, 177 N. E. 416 (N. Y.). See also, *Martin G. Imbach, Inc. v. Tate*, [203 Md. 348, 100 A. 2d 808 (1953)]." *Id.* at 367.

This case is in no way comparable to that of *Fredericks v. Northern Cent. R.R.*, 157 Pa. 103, 27 A. 689, 22 L.R.A. 306 (1893), cited by B & O. In that case a throw-off switch which would have derailed the coal cars had been closed by the trespasser so that it was not operative. The coal cars had been detached by the trespasser from other cars to which they were coupled. The brakes which had been set previously were loosened by the trespasser. The Pennsylvania court said:

"It will thus be seen that the collision was produced by the criminal trespass of a stranger to the defendant company, for whose acts they were not in the least degree responsible, and over whom they had no control. The offence of which the boy McCoskey was guilty, in misplacing the switch, was a most atrocious and abominable crime * * *." *Id.* at 115-16.

* * *

"Here the injury was not the result of any defect in any of the appliances used by the defendant, nor by any want of skill, foresight and diligence which was humanly possible. The injury was not the result of any act of carelessness or negligence on the part of anybody. It was the result, exclusively, of a deliberate, intended, willful, affirmative, positive act of criminal trespass. No mere act of carelessness or

negligence could have turned over the switch, which was set to derail the cars, so that it would throw the cars on the track instead of off. No mere act of carelessness or negligence could, or would, have taken out the coupling pin which held the cars together. No mere act of carelessness or negligence could, or would, have driven back the ratchet which held the brakes in place, four of them in all, so as to set the cars in motion. All, and every one, of these acts required special physical effort, exerted for the very purpose of releasing the cars from the entirely sufficient restraints which had been imposed upon them by the company's agents, and these efforts were made each one after the other, in a wicked and deadly succession, until the horrible purpose was accomplished and the work of death and destruction resulted." *Id.* at 119-20.

It likewise is not comparable to *Mars v. Delaware & H. Canal Co.*, 54 Hun 625, 8 N.Y.S. 107 (1889), also cited by B & O, in which it was conceded that the engine was moved maliciously.

As we see it, this case is controlled by the holding of our predecessors in *Maryland, D. & V. Ry. v. Brown,* 109 Md. 304, 71 A. 1005 (1909), cited in Annot., 24 A.L.R. 124 (1923), entitled "Negligence in leaving live locomotive unattended." That railroad operated between Love Point at the northern tip of Kent Island in Queen Anne's County and what was then known as Rehoboth but is now known as Rehoboth Beach, Delaware. The bridge across Kent Narrows was just south of the present U. S. Route 50 highway bridge.[2] At about 8 o'clock on an August evening in 1905 a passenger train had just crossed Kent Narrows onto Kent Island when it had a head-on collision with a runaway locomotive which, as Judge

2. *See* County Comm'rs v. County Comm'rs, 50 Md. 245 (1879), for interesting background relative to construction and financing of an earlier highway bridge at this location.

Pearce put it for the Court, "was unmanned and running wild on the same track". The engine had been left on a siding with wheels chocked and "a bar in the centre". It had been examined at 5:30 on the evening of the accident at which time it was found that "her throttle bar and reverse bar were all right and she was in first class condition for service". There was conflicting testimony as to the condition of the engine with particular reference to its throttle. The railroad moved for a directed verdict on the ground that since the evidence showed that the engine was placed on a side track with "her steam shut off by the closing of her throttle valve, her reverse bar in the centre and her wheels chocked" and since there was "no evidence to show that engine No. 1 was defective in such a way that she could start off in the condition and under the circumstances in which she was placed by the witness Exeter on said side track, and inasmuch as the evidence show[ed] that the defendant employed competent employees and placed them in charge of said engine", the verdict should be for the defendant. Judge Pearce said for the Court:

> "We think, notwithstanding Exeter's testimony on that point, that it was still a question for the jury whether the actual starting, which was proved, was due to the negligence of the defendant either in the original purchase of a defective engine, in the failure to make proper inspection, or to keep a proper watch on the engine while standing on the track, and these prayers were in our opinion properly rejected."
> *Id.* at 321.

The presence of young trespassers in the railroad yard and on the locomotives with the knowledge of the agents and servants of B & O was shown. It does not take much effort to foresee that a young man who might look for gloves or fusees in an engine cab might be tempted to move a throttle bar just to see how it works. It un-

doubtedly was for the purpose of forestalling the sort of thing which here took place that provision was made for the variety of controls in the engine cab to which we have heretofore made reference. It is probable that those controls were intended to make unnecessary the type of control used in *M., D. & V. v. Brown* (chocked wheels and "bar in the centre"). It is conceded that for this locomotive to move three things had to happen: the isolation switch had to be "on"; the run button had to be "on"; and the throttle had to be moved. The boys said they touched no control other than the throttle which they claimed to have fallen against. As a matter of fact, there was a question as to whether, in the light of its construction, "falling against" the throttle would have actually moved it. If the controls of the engine had been left as B & O's employees say they were left, moving the throttle would not have placed the engine in motion. Therefore, an issue of credibility was raised for determination by the jury.

## CONTRIBUTORY NEGLIGENCE

B & O claims Plews was guilty of contributory negligence as a matter of law and that, therefore, its motion for a directed verdict at the conclusion of the defendant's case and its motion for a judgment *n.o.v.* should have been granted.

In pressing its points relative to contributory negligence B & O analyzes the decedent's duties "for the purposes of clarity" in two phases: the first is "whether the decedent's reliance on defendant's voluntarily imposed custom of flagging the crossing in question relieves the decedent of any further duties to be observed on his part for his own safety and in effect grants him the license or privilege to proceed across defendant's tracks at the grade crossing in question in total reliance on the absence of the customary flagman"; the second is "if the decedent was obliged to observe some precaution for his own safety, notwithstanding the absence of the defen-

dant's flagman, do the uncontroverted facts in evidence dictate that, as a matter of law, the decedent was guilty of contributory negligence, thus preventing the plaintiffs from recovering damages from the defendant."

In considering contributory negligence we must bear in mind the basic rules of law here applicable as summarized in *Balto. Transit Co. v. Castranda,* 194 Md. 421, 71 A. 2d 442 (1950) :

> "The question of contributory negligence must be considered in the light of all the inferences favorable to the plaintiff's case that may be fairly deduced from the evidence. Where there is a conflict of evidence as to material facts relied on to establish contributory negligence, or more than one inference may be reasonably drawn therefrom, the question should be submitted to the jury. In order that a case may be withdrawn from the jury on the ground of contributory negligence, the evidence must show some prominent and decisive act which directly contributed to the accident and which was of such a character as to leave no room for difference of opinion thereon by reasonable minds. * * * In addition, before a person killed in an accident can be declared to have been guilty of contributory negligence as matter of law, the trial court must give consideration to the presumption that he exercised ordinary care for his own safety in accordance with the natural instinct of human beings to guard against danger." *Id.* at 434.

The burden of proving contributory negligence is on the defendant, in this instance B & O. *Gresham v. Comm'r of Mot. Veh.,* 256 Md. 500, 509, 260 A. 2d 649 (1970).

We approach this case bearing in mind what Judge Adkins said for the Court in *Baltimore & O. R. R. v. Windsor,* 146 Md. 429, 439-40, 126 A. 119 (1924). There, in

response to the argument that to refuse to pass upon the question of contributory negligence as a matter of law would be equivalent to holding that in *every suit* growing out of an accident at a crossing, where there was a bell and in which there was any evidence of a failure of the bell to ring, the question of contributory negligence must be submitted to the jury, he said the Court was dealing only with the facts and circumstances of that particular case. Here too we are concerned only with the facts and circumstances of *this* case.

This case is close to the situations which prevailed in *Patapsco R. R. v. Bowers,* 213 Md. 78, 129 A. 2d 802 (1957), and *Pachmayr v. Baltimore & O. R.R.,* 157 Md. 256, 145 A. 611 (1929). In *Bowers* Judge (now Chief Judge) Hammond prefaced his review of a number of prior Maryland cases, including *Windsor,* involving crossing accidents, with the comment:

> "This Court has four times decided that an implied invitation arises from the failure of a railroad to warn of the approach of a train at a crossing, where it customarily gives such a warning and that such an assurance of safety lowers the standard of care ordinarily required of a motorist at a crossing and has an important bearing upon whether or not, under the circumstances, due care was used by the injured plaintiff. [ (citing cases) ]" *Id.* at 82-83.

> *Pachmayr* was summarized in *Bowers* as follows:

> "The *Pachmayr* decision was one in which a railroad conductor, while driving a truck, was struck at a crossing at which he often worked for the railroad, by an engine running backwards. It was the railroad's custom to stop engines before sending them over the crossing and to post a flagman to warn traffic whenever a crossing was to be made. When Pachmayr was ten or twelve feet from the tracks, he

slowed down, noticed the engine backing, and then went on, and was hit and killed. Judge Urner, speaking for the Court, said that before the victim could be judicially declared to have been contributorily negligent, due consideration must be given not only to all inferences of fact tending to support the opposite view, 'but also to the important presumption that he exercised ordinary care for his own safety. * * * It does not appear that he drove on the track without looking for dangers which might be imminent, and that he thus acted in heedless and complete reliance upon the assumption that the practice of posting flagmen for passing trains or locomotives would in no instance fail to be pursued. * * * This case is an appropriate one for the application of the principle that, while a traveller on a highway is not relieved of the duty of exercising care at a railroad crossing because the danger signals usually employed there, to his knowledge, are not at the time displayed, yet the implied assurance of safety from the absence of the customary warning is a circumstance materially affecting the question whether the proper degree of care was exercised.' Contributory negligence was held to be for the jury, essentially because of the lack of warning plus a right to assume the engine would stop before crossing as it usually did." *Id.* at 85.

In *Bowers* a truck driver made a full stop and looked right and left before crossing the first of three tracks. There was nothing on the first and second tracks, but on the third he saw a diesel locomotive to his right, about 75 feet from the crossing. It was standing still with some of the crew standing around it. He crossed the tracks slowly. At the second or middle track when he was about 75 feet from the third track he looked right and left again and saw the rear of the diesel locomotive, still

motionless where he had first seen it. A large mobile crane between the middle and third tracks blocked out the rest of the locomotive at that point and thereafter all of it until the truck driver was some 25 or 35 feet from the third track. After he saw the locomotive for the second time he continued on toward the third track. He did not thereafter look to his right. His stated reason was that having seen the diesel standing still with men around it on the ground when he was at the first track and having again seen it still motionless when he was at the second track, he thought it was not going to move across the road. He said his belief was reinforced by the fact that there was no watchman to flag down vehicular traffic. There was testimony that the usual procedure was for a brakeman to guard the crossing when trains were about to cross it. His attention was also diverted in the last 25 to 30 feet before reaching the third track by a tractor-trailer approaching on the narrow roadway from the opposite direction. The plaintiff's trailer was struck by the diesel locomotive after the tractor and some six to eight feet of the trailer had crossed the third track. It was established that the railroad's operating rules required a man to ride on the front of the locomotive whenever such shifting operations were taking place.

On the issue of contributory negligence in *Bowers,* the Court said:

> "Bowers' testimony was that not only was he reassured by the absence of any watchman or flagman, but that this implied invitation to a safe crossing, together with the view he had of the stationary diesel locomotive, with its crew standing on the ground, seen one hundred sixty feet from the third track and the second view of the diesel, still motionless, when he was seventy feet from the third track, combined to make him believe that there was no need to look further. We cannot say that reasonable minds would

unite in deciding that failure to look during the passage of the last twenty-five to thirty-five feet, under such circumstances, was imprudent or the act of a man disregarding his own safety. As has been noted in various other cases, it is against all human experience to reckon that an ordinarily prudent man would not be influenced by the substantial assurance of safety given by the absence of the customary warning usually relied on. Here there was not only that reliance but the further assurance given by the motionless diesel. We think the question of contributory negligence properly went to the jury." *Id.* at 88-89.

As B & O notes, during the time that Plews was passing the tractor-trailer his view of the railroad to his right was obscured. B & O sees evidence of the contributory negligence of Plews in that "it is mathematically demonstrable that the runaway locomotive would have been in plain view of decedent had he looked in the direction from which it came" since it "traversed a section of track which was open and fully visible from Pennington Avenue for more than 900 feet from the point of impact". It is true that under our holdings in *Lord v. Pennsylvania R. R.*, 251 Md. 113, 118, 246 A. 2d 231 (1968), and *Sears v. Baltimore & O. R. R.*, 219 Md. 118, 123, 148 A. 2d 366 (1959), and cases cited, Plews is charged with seeing that which if he had looked he must have seen. However, there is no evidence presented that it would have been possible for Plews at that time to have stopped his vehicle. There is not even an intimation that traffic immediately ahead of Plews or coming from the opposite direction was stopping or slowing. To the contrary, the tank truck driver testified there were several vehicles ahead of him which continued on in a normal manner, "like nothing was wrong. Nothing to stop them, so they just kept on going."

At the time he began to pass the tank truck, Plews

had every right to assume based upon his own prior observations that any oncoming locomotive in accordance with the rules and regulations of B & O would stop and yield the right of way to vehicular traffic, not proceeding across the highway until a member of the train crew had first halted oncoming vehicles. Judge Hammond said for the Court in *Sanders v. Williams*, 209 Md. 149, 120 A. 2d 397 (1956) :

> "As is true of primary negligence, one measure of contributory negligence is the need, in a given situation, to anticipate danger. Presence or absence of reasonable foresight is an essential part of the concept. One is charged with notice of what a reasonably and ordinarily prudent person would have foreseen and so must foresee what common experience tells may, in all likelihood, occur, and to anticipate and guard against what usually happens. On the other hand, one is not bound to anticipate every possible injury that may occur or every possible eventuality. * * * Absent actual or constructive knowledge to the contrary, one may act on the assumption that he will not be exposed to danger that will come only by the breach of duty which another owes him. He is not bound to anticipate negligent acts or omissions on the part of others unless, under the circumstances, an ordinarily prudent person would know, or should know, that it was not safe to make the assumption of due care on the part of the other person. * * * The standard of care to be used in measuring contributory negligence is the conduct of an ordinarily prudent person under the same or similar circumstances, and not that of a very cautious person, and even if the doing of what was done turns out to have been an error of judgment, this of itself does not make the act negligent if an ordinarily prudent person would

have made what proves to have been the same error. We think that the appellee neither did, nor failed to do, anything that an ordinarily prudent person would not have done or failed to do." *Id.* at 152-53.

There is no evidence here of great speed on the part of Plews. He did not quickly overtake the tank truck which was said to be traveling at about 30 miles per hour, but used up most of the 300 feet to the crossing. In other words, he seems to have been proceeding in a normal manner with traffic. We can not say that reasonable minds would unite in deciding that an ordinarily prudent person on a busy four lane highway with no evidence of slowing of other traffic, with Plews' knowledge of B & O's practice at the crossing, and no signs of a flagman at the crossing, would not pass the tank truck when he did, despite the fact that his view of the tracks to the right would be obscured. Therefore, to find Plews guilty of contributory negligence as a matter of law we must conclude that he did not take those precautions for his own safety which he is presumed to have taken in the few seconds of clear vision that he had while traveling that last 50 feet—looking to his right and to his left and seeing that which he must have seen—or we must conclude that with Plews' background of knowledge of this crossing an ordinarily prudent person under the conditions then prevailing would have brought his vehicle to a near halt before crossing the tracks. We can not say with certainty that he drove on the track without looking for danger which might be imminent. If we had been sitting as triers of fact we might have concluded that Plews was guilty of contributory negligence, yet reasoning minds might differ. Therefore, we can not say that Plews was guilty of contributory negligence as a matter of law. The question was one for the jury.

## THE COURT'S INSTRUCTIONS TO THE JURY

B & O makes seven specific complaints relative to the

instructions to the jury. One of these concerns the instruction:

"Members of the Jury, you are instructed,— and you heard this read. I believe that is Regulation 871-A of the Rules and Regulations of the Operating Department of the B & O Railroad Company. It requires that engineers, before leaving the cab of a locomotive, that has the engine running, the throttle should be at idle, the reversing lever removed or locked in neutral position and, where used, the generator field switch should be open. The independent brake should be fully applied. If the locomotive is not to be left in charge of a hostler or shop forces, the hand brake should also be applied."

B & O complains:

"The rule in question was not promulgated to establish a standard of care owing to the plaintiffs' decedent in the instant situation and, accordingly, any violation of the rule would not constitute actionable negligence as to said decedent nor would it be evidence of negligence."

The matter of such an instruction was before this Court in *Creasey v. Pennsylvania R. R.*, 190 Md. 586, 59 A. 2d 190 (1948). There Judge (later Chief Judge) Henderson said for this Court:

"The plaintiffs offered in evidence certain rules of the railroad company, which were quoted in our former opinion [ (*Pennsylvania R. R. v. Brewer*) ]. We there said, 188 Md. 646, 652, 53 A. 2d 562, 565: 'The defendant concedes the adoption of these rules and their admissibility in general. *State v. Baltimore & O. R. Co.*, 157 Md. 256, 145 A. 611. It contends, however, that they were inapplicable to the situation presented in the instant case, and hence not relevant.

\* \* \* the rules taken together seem clearly designed to afford protection, in the shape of a flagman, against the danger from other trains or engines as well as from switching movements. They recognize the need for a warning in substitution for the blinkers, which would be meaningless or inadequate in such a situation, as a warning of the approach of a second train.'

"The appellee now contends that it made no such concession, and that the rules were inadmissible. It attempts to distinguish *State v. B. & O. R. Co., supra,* on the ground that an employee was there involved. We think the distinction is untenable. The general rule, supported by the best considered cases, is stated by Wigmore (2 *Wigmore, Evidence,* 3d Ed., § 282) : 'the regulations adopted by an employer for conduct of a transportation system may be some evidence of his belief as to the standard of care required and thus of the negligent nature of an act violating those rules.' " *Id.* at 597-98.

\* \* \*

"\* \* \* The rules are admissible upon the theory that they constitute admissions as to the standard of care \* \* \*." *Id.* at 599.

We have carefully reviewed the remaining exceptions to the instructions. The now oft quoted statement for the Court by Judge Prescott in *Wilhelm v. State Traffic Comm.,* 230 Md. 91, 185 A. 2d 715 (1962), is applicable here:

"[W]e have said that the trial court's instructions must be considered as a whole; that the charge need not comply with the technical rules of formal written prayers; that this Court will not be overly critical of the words used by the trial judge if the result is sufficient, *Lloyd v. Yellow Cab Co.,* 220 Md. 488, 154 A. 2d 906;

and, even if an erroneous instruction were given, it did not constitute a ground for reversal in the absence of prejudice, *Connor v. State*, 225 Md. 543, 171 A. 2d 699." *Id.* at 102.

We detected no error in the instructions.

### MOTION FOR MISTRIAL

B & O claims that in his opening statement counsel for the plaintiffs "made a number of 'statements' of an argumentive or improper nature, which said comments gave rise to timely and well-founded motions for mistrial." There were actually four instances in which a motion for mistrial was made based upon the comments of counsel. At the time of the second motion the trial judge commented:

> "Gentlemen, I think this, what is an opening statement and argument is sometimes pretty difficult to determine, but I do feel that at this point that—I am not going to grant the motion yet—but I do feel that Mr. McManus is getting [awfully] close to the borderline to what is argument and what is opening statement. For goodness sake, keep to the facts of the case. Actually you are getting awfully close to the argument. Give the Jury any facts you wish to prove. You are entitled to that. But don't get into the argument. That you will have plenty of time to argue later on. I'm not going to grant the motion. I do now make that suggestion to you."

A corrective instruction was given at the time of the third motion.

The rule in such cases was set forth by Chief Judge Hammond in *DeMay v. Carper*, 247 Md. 535, 233 A. 2d 765 (1967), where he said for the Court:

> "[I]mproper or prejudicial statements, remarks or arguments of counsel generally are cured by

reproof by the trial judge; to his discretion customarily is left the choice of methods to protect the fair and unprejudiced workings of the judicial proceedings and his decision as to the effect of that choice upon the jury and only in the exceptional case, the blatant case, will his choice of cure and his decision as to its effect be reversed on appeal. [ (citing cases) ]" *Id.* at 540.

In this instance, Judge Carter did not abuse the discretion lodged in him.

## ALLEGED IMPROPER CLOSING ARGUMENT

B & O next complains relative to the closing argument of counsel for the plaintiffs. The short answer to this is that no motion was made for mistrial. Therefore, it was not brought to the attention of the trial judge and there is nothing before us for our consideration. Maryland Rule 885; *Jones v. Federal Paper Bd. Co.*, 252 Md. 475, 495, 250 A. 2d 653 (1969) ; and *Brinand v. Denzik*, 226 Md. 287, 292, 173 A. 2d 203 (1961).

## THE TESTIMONY OF FAITH PLEWS AIREY

Faith Plews Airey, unmarried, 17 years of age, and a high school senior at the time of her father's death, was called as a witness for the plaintiff. At one point the record is as follows:

"Q. What did you observe with respect to his activities or services that would have a monetary value with respect to your mother and your two brothers, Randy and Michael Paul?

" (Mr. Smouse) Objection.

"By Mr. McManus:

"Q. If anything.

" (Mr. Smouse) Objection.

" (The Court) Overruled, you may answer.

" (The Witness) Do you mean what did he do for them moneywise?

"By Mr. McManus:

"Q. I am asking you to describe, either in terms of actual money, or in terms of work or services that would have a monetary value that would be directed on his part, either toward your mother or to your two brothers? A. Well, my father was a very devoted, faithful worker, and he always brought home his paycheck and gave it right to my mother. He never went to a bar after work. He was home every night, and I think that has a lot to do with his bringing his paycheck home. He didn't stop at any bars or anything. He always gave my mother the check and, like, he only spent about $5 or $10 a week on his lunch money because he was home every night for dinner. Anyplace we wanted to go, he would take us together as a family. Any clothing for the boys, any activity they wanted, he did the same for them and for my mother as he would for me, and it was the same when my sisters were living home too.

"Q. What kind of activities would he perform with respect to the boys that would have a monetary value? A. Well, my brothers took guitar lessons and—

"Q. What did he do in the form of disciplinary guidance or moral or religious training, if anything. A. My father took us to church.

" (Mr. Smouse) Objection. I don't know that it is relevant.

" (The Court) I think that is getting beyond the purview of the examination. It certainly doesn't affect financial problems. I am going to let her answer.

" (The Witness) Well, my father took us to church every Sunday and we also went to prayer meetings on Wednesday nights. We went together as a family. We had a family worship

at night. My father always said the blessing before he ate a meal. He taught us to do the same. My father didn't just give us money or material things, it was the love, and that is what we miss right now, his counselling. It's not so bad on me right now. I am married, but I have two brothers, but—

"(The Court) I think you are going outside the question.

"(Mr. McManus) No further questions.

"(Mr. Smouse) We have no question, Your Honor."

B & O contends that this question was improper and says that "the prejudicial response was in no sense related to any compensable element of damages" and claims it was "clearly designed to prompt sympathy on the part of the jury".

Under the law applicable to this case recovery is limited to the pecuniary benefit which the children had a right to expect from the continuance of their father's life. *Bowman v. Wooleyhan Transport Co.*, 192 Md. 686, 693, 65 A. 2d 321 (1949).

B & O made no motion to strike the answer of Mrs. Airey. The trial judge, it will be noted, discontinued the interrogation on his own motion.

Judge Carter instructed the jury, without objection from B & O, that they should allow the minor children such amount as they thought would compensate them "for the loss of the comfort, education and position in society which they would have enjoyed if their father had lived and had retained his income". In the case of Mrs. Airey this was qualified with the provision had she "continued to form a part of [the deceased's] family", while with the younger children it was if they had "continued to form a part of his family until they arrived at the age of twenty-one." This instruction was in line with that in *Balto. Transit Co. v. Castranda, supra,* where the Court said:

"In the case of the children of a person killed by negligence, the jury may estimate the prospective damages up to the time of their marriage or majority. The children may recover for the loss of the comforts, education, and position in society which they would have enjoyed if their father had lived and retained his income and they had continued to form part of his family. *Baltimore & Ohio R. Co. v. State, to Use of Hauer,* 60 Md. 449, 467." 194 Md. at 437.

If the objection to the question to Mrs. Airey were improperly overruled, the size of the jury's awards for these children taken in conjunction with the proper instruction on the issue of damages does not convince us there was prejudicial error.

## THE TESTIMONY OF THE ECONOMIST, FARBER

### (i)

B & O first objects to the fact that when it moved to strike the testimony of the economist after the close of direct examination on the ground that no proper foundation had been laid for the opinion given and that the witness had not given the basis for arriving at his opinion, the trial judge permitted the plaintiffs to reopen the case for the purpose of laying a better foundation for the testimony. In response to the objection of B & O, Judge Carter commented that he thought it was "a matter of discretion". It was. We see no abuse of that discretion. In *Willey v. Glass,* 242 Md. 156, 218 A. 2d 212 (1966), Judge Marbury said for the Court:

"Whether a case shall be reopened for the taking of additional testimony rests within the sound discretion of the trial judge; and from his grant or refusal to grant the request to reopen, ordinar⁚ no appeal will lie. [(citing authorities)]" *Id.* at 163.

In *Gordon v. Opalecky,* 152 Md. 536, 137 A. 299 (1927),

an expert witness was temporarily withdrawn from the stand and the plaintiff recalled in order to establish a predicate for a hypothetical question asked of the expert, a physician. Judge Offutt there said for the Court:

"The appellant then moved to strike out this testimony, which motion was overruled, and that ruling is the subject of the third exception. The testimony itself was relevant and material, and the order in which it was given was within the discretion of the trial court. And since the record discloses no abuse of that discretion, it follows that there was no error in that ruling." *Id.* at 544.

(ii)

B & O also takes issue with certain testimony of the expert which it says was "defective and too fraught with speculation in that it made allowance for a 'projected rise in the level of earnings' in the amount of 4¾ percent per annum." It then adds, "[T]he Court erroneously allowed the witness to testify to an allowance of $33,672 in the damage projection of $162,018 predicated on loss of paternal care." It finds particularly objectionable that portion of the expert's answer in which he said:

"First, on the basis of the decedent's occupation, which was that of a foreman in construction, and utilizing data published by the United States Bureau of the Census, with respect to what they call the indigeneration [(sic)] occupational mobility of children of fathers in various major economic groups, I calculated the probabilities that each of the three respective children of the decedent would have entered each of the seven major occupational groups. I then calculated the lifetime earnings and the amount of money needed to invest in these children, so that they could earn the stipulated lifetime earnings in each of these occupations which

were weighted by the probability that they would have entered them, given the socio-economic status of the father. Then based on various techniques which we have developed in the Manpower Administration of the United States Department of Labor, we took this capital sum and prorated it to reflect the proportion of the total training which these children would have when they entered the labor market, which are properly attributable to paternal care. That paternal care varies in each instance with the age of the respective children."

It states that it moved to strike this opinion "based on it being of a highly speculative, conjectural and not even understandable nature". As previously indicated, an objection was originally made to the testimony of the expert. As a part of this additional evidence developed from the expert by counsel for plaintiff, the expert was asked "to state the various life expectancies and the various discounting aspects in every detail for [his] opinion." An objection to that question was overruled and he then proceeded to answer:

"I find that the average person in the decedent's circumstances would have worked to attained age 65, a total of 18.47 years; that he would have been without employment a total of 1.53 years. Based on these man years of employment and using a base of $10,000 a year, one multiplies the number of man years of employment, taking due account of the projected rise in the level of earnings, which I find to be four and three quarters percent, I then arrived at the undiscounted—that is, the total value of the earning capacity of the average person of the decedent's circumstances."

The then next question was, "What was that?" to which the answer "$287,707" was given with an indication of

the discount "to present worth" or $170,445 from which was deducted "the projected personal consumption expenditures of approximately twenty-five percent, leaving a net total of approximately $128,000" as "the net loss of earning capacity of the average person in the decedent's circumstances." The expert then continued by saying, "With respect to the loss of paternal care, I took these factors into account." It was at this point that he stated that to which B & O now objects. All of this came in in response to the question, "What was that?", to which no objection was made. No motion to strike was made at the conclusion of the answer to the question. A number of other questions and answers then went into the record. The plaintiffs attempted to introduce as evidence the expert's report. B & O successfully objected to its introduction. There was then discussion as to whether cross-examination of the expert could be concluded on that day or whether it would be necessary for him to return. Only after all of that was the motion to strike made.

B & O is deemed to have consented to the introduction of the testimony and the subsequent motion to strike may be denied by the trial court because it neither objected at the time the question was asked nor did it move to strike immediately after the answer. *Coal Co. v. Balchumas,* 174 Md. 453, 462, 199 A. 534 (1938) ; *Scarlett v. Young,* 170 Md. 358, 365, 185 A. 129 (1936) ; *Rent-A-Car Co. v. Fire Ins. Co.,* 161 Md. 249, 263-64, 156 A. 847 (1931) ; *Realty Co. v. Sachse,* 154 Md. 34, 39, 139 A. 529 (1927) ; and *Bramble v. Shields,* 146 Md. 494, 507, 127 A. 44 (1925). The objection interposed before the answer to the preceding question can not be held applicable. In *State Roads Comm. v. Bare,* 220 Md. 91, 151 A. 2d 154 (1959), Judge (later Chief Judge) Prescott said for the Court:

> "Rule 522 d 2 reads that '[e]very objection to the admissibility of evidence shall be made at the time when such evidence is offered, or as soon thereafter as the objection to its admissi-

bility shall have become apparent, otherwise the objection shall be treated as waived.' The committee's note states: 'Counsel are cautioned that in the light of the Court of Appeals construction of its former Rule 17, which is the foundation for Rule 522, a ruling of the court must be obtained upon each objection, in order to lay the proper foundation for an appeal.' Generally speaking, specific objection should be made to each question propounded, if the answer thereto is claimed to be inadmissible. If counsel makes an objection to a question and that objection be permitted to remain effective throughout the trial to subsequent identical or similar question or questions relating to the same subject matter, without the consent or agreement of the trial court, there would be constant bickering and arguing as to whether subsequent questions were encompassed within the original objection." *Id.* at 94-95.

Accordingly, there was no error in overruling the motion to strike.

> *Judgments affirmed; appellant to pay the costs.*