148 N.J. Super. 387 (1977)
372 A.2d 1108
MACK TRUCKS, INC., PLAINTIFF-APPELLANT AND CROSS-RESPONDENT,
v.
READING COMPANY, INC., A CORPORATION, ET AL., DEFENDANTS-RESPONDENTS, AND THE HEIL CO., A CORPORATION, DEFENDANT-RESPONDENT AND CROSS-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued December 21, 1976.
Decided March 8, 1977.
*390 Before Judges MATTHEWS, SEIDMAN and HORN.
*391 Mr. John L. McGoldrick argued the cause for appellant and cross-respondent Mack Trucks, Inc. (Messrs. McCarter & English, attorneys; Richard D. Quay, on the brief).
Mr. Raymond W. Troy argued the cause for respondents Reading Company, Inc., et al. (Messrs. Lum, Biunno & Tompkins, attorneys; Mr. Wayne J. Positan, on the brief).
Mr. Marc I. Bressman argued the cause for respondent and cross-appellant (Messrs. Budd, Larner, Kent, Gross, Picillo & Rosenbaum, attorneys).
The opinion of the court was delivered by SEIDMAN, J.A.D.
On August 13, 1971, at about 12:05 a.m., a Reading Company freight train consisting of 129 loaded coal cars, two empties, and three Diesel engines was proceeding through Woodbridge, in Middlesex County, on its way to Carteret. As it approached a spur leading into the adjoining Heil Co. plant the engineer observed that the switch was aligned for the siding, instead of the main track. Despite his immediate application of emergency brakes, the train could not be stopped in time. It went onto the spur, causing considerable property damage on the Heil premises before coming to a halt after being derailed.
Plaintiff Mack Trucks, Inc. filed a negligence action against Reading and Heil to recover $132,502.20 for damage to truck bodies and chassis which it had delivered to Heil for certain work to be done on them. Heil cross-claimed against Reading for the damage to its property in the amount of $35,129.14.
As a trial limited to the issue of liability, damages having been stipulated, Mack's claim against Heil was dismissed by the court. The jury resolved the issue of Reading's liability in favor of Mack and Heil. Thereafter, Reading moved for judgment n.o.v. and, alternatively, for a new trial. After hearing argument thereon, the trial judge granted the motion for judgment n.o.v., with the proviso that if the court was *392 adjudged on appeal to be in error in this regard, then a new trial would be granted. Mack and Heil appealed from the resultant judgment, which recited only that "[o]n motion by the attorney for the defendant, Reading Co., the Court granted an Involuntary Judgment Dismissal [sic] as to the complaint of Mack Trucks, Inc. and the counterclaim of the Heil Co."
For reasons which follow, we reverse and reinstate the jury verdict.
We address ourselves first to the granting of the motion for judgment n.o.v. In reviewing the action taken by the trial judge we are required to consider whether he correctly applied the standard set forth in Dolson v. Anastasia, 55 N.J. 2, 5 (1969). On such motion (R. 4:40-2), the test is whether
"The evidence, together with the legitimate inferences therefrom, could sustain a judgment in * * * favor" of the party opposing the motion, i.e., if, accepting as true all the evidence which supports the position of the party defending against the motion and according him the benefit of all inferences which can reasonably and legitimately be deduced therefrom, reasonable minds could differ, the motion must be denied. * * * The point is that the judicial function here is quite a mechanical one. The trial court is not concerned with the worth, nature or extent (beyond a scintilla) of the evidence, but only with its existence, viewed most favorably to the party opposing the motion. [at 5]
It is not in dispute that the mishap was caused by an open switch which diverted the Reading train from the main track onto the spur leading into the Heil property. There was also uncontroverted proof at the trial that when a train passed in the opposite direction about three or four hours earlier, the switch was apparently aligned correctly; otherwise, it would have sustained damage. The clear inference was that sometime during those hours the switch was thrown by some unauthorized person or persons. There was no evidence that any freight cars were scheduled to be switched onto the Heil siding that night. Furthermore, the freight cars which were *393 on the Heil property had been placed there by a Reading switch crew on the day prior to the accident. Two or three times a week a switch crew came into the area of the Heil plant to place cars on its siding and also on others.
From the proofs adduced at the trial a jury could also have found these additional facts: In the course of the investigation following the accident a padlock used to secure the switch stand when not in use was found lying alongside the open switch. A sandy substance on the padlock matched a rock, broken parts of which were picked up nearby. Three or four years earlier a similar type of derailment had occurred on the Reading track within three miles of the Heil plant, caused, according to the police investigation, by juveniles who had broken open the lock that kept the switch in place. The railroad also had reports of five incidents of damage to flasher lenses, equipment and a crossing gate, all occurring since the beginning of 1971 and from 1 to 2 1/2 miles east of the Heil siding.
Expert testimony was given by a locksmith called on behalf of Mack. He testified that when he examined the padlock at Woodbridge police headquarters in 1975 he "sincerely doubt[ed]" that the locking bar could have been broken by a rock striking the lock from the outside, because of rust inside the hole of the lock where the break occurred. In his opinion the lock should not have rusted during the four-year period "if it had been a usable lock prior to the time the police had it." The lock, he said, was not functional at the time of the incident and, moreover, striking an unbroken padlock with a stone could not cause it to open. He expressed the "personal opinion" that the padlock had been broken for some unknown period of time and "it was put on the switch and just closed and it looked like it was a normal standard padlock * * *, so that if a railroad employee came to check the lock and looked at the outside, it appeared locked."
The trial judge reserved decision on Reading's motion for judgment at the close of the evidence and submitted the case to the jury, which, as noted above, found in favor of Mack *394 and Heil on the issue of liability. In granting Reading's subsequent motion for judgment notwithstanding the verdict, the trial judge held that even if Reading were negligent in not having a fully operable lock on the switch, "such negligence was not a proximate cause of the damages suffered by Mack and Heil in that some unknown third person committed the criminal act of throwing the switch." There was, he reasoned, an intervening cause for which Reading was not responsible and which it could not foresee. He added that while there was evidence of an "attack upon a switch" several years before within three miles of this location, "there was no repetition of such attack." He said further that from the evidence "the legitimate inference at most can amount to a possibility of criminal conduct in the area." As for the padlock, he said:
* * * The argument is, why did the Reading use locks, if not to protect against criminals throwing switches? The answer is that there is a need to protect against inadvertence. There is a need to protect against what we regard as negligence in the operation of switches. You're using trains over this area, you're shipping cars in and out, and that there is a need to have only authorized personnel operate the switches. * * *
The trial judge concluded that there was not "sufficient evidence here that reasonable men could differ * * * as to the probability of criminal act in relation to the duties that Reading owed" to Mack and Heil.
We think that the trial judge went beyond his "mechancial" function under Dolson v. Anastasia, supra, of merely determining the existence of evidence which, viewed most favorably to the parties opposing the motion, could sustain a judgment in their favor.
It should be observed at the outset that our concern here is not with any issue of whether a padlock should have been provided for the switch, or whether the locking device actually furnished, assuming its operability, was suitable for that purpose. A lock was supplied and there was no competent proof that it was not an appropriate one. However, *395 the trial judge seems to have drawn the inference that the padlock was intended only to protect against negligence or inadvertence in the operation of the switch. Undeniably, such inference was proper. But an equally reasonable one was that the purpose of having a lock on the switch stand was also to forfend tampering with the switch by intruders bent on mischief. Since this inference favored the cause of Mack and Heil, they were entitled to its benefit on the motion for judgment n.o.v. Dolson v. Anastasia, supra.
There was, moreover, evidence in this case from which the jury could have found, directly or by inference, that the lock had been broken prior to the accident; that railroad personnel had occasion to open and close the switch in question several times a week; that in doing so they would have used a key for the lock, and that in the exercise of reasonable care they would have discovered that the lock was broken and notified their superiors so that action could be taken to repair or replace the lock. We think it was clearly for the jury to determine, in the circumstances, whether if there was such failure to exercise reasonable care, the omission constituted negligence chargeable to the railroad.
The crucial issue at the trial, of course, was proximate cause. It cannot be seriously doubted that the derailment here was brought about by an act of vandalism amounting to a criminal offense.[1] Ordinarily, where there intervenes between the original negligence and an accident a malicious, willful and criminal act of a third person which causes the damage, which act could not reasonably have been foreseen, the causal chain is broken and no liability results. See Annotation, "Intervening criminal act as breaking causal chain," 78 A.L.R. 471, 472 (1932). The polestar is foreseeability. It is not necessary that a tortfeasor anticipate the very occurrence *396 which resulted from his wrongdoing; it is sufficient that the resulting injury was the natural and probable consequence thereof and it was within the realm of foreseeability that some harm might result. Bacak v. Hogya, 4 N.J. 417, 424 (1950). But the intervening acts of third persons, if reasonably foreseeable, do not relieve the tortfeasor from liability for his negligence, the theory being "that the original negligence continues and operates contemporaneously with an intervening act which might reasonably have been anticipated so that the negligence can be regarded as a concurrent cause of the injury inflicted." Menth v. Breeze Corporation, Inc., 4 N.J. 428, 441 (1950).
In Genovay v. Fox, 50 N.J. Super. 538, 550-551 (App. Div. 1958), rev'd on other grounds, 29 N.J. 436 (1959), a case involving injuries to the customer of a bowling alley-bar sustained when he was shot by a gunman, we said:
The fact that the risk of harm to the plaintiff was attributable to voluntary activity of others not under the control of the defendant does not of itself preclude liability if the harm by human intervention was foreseeable and a reasonable man so situated would take precautions to prevent it. * * * The criminality of the activity is but one circumstance in the foreseeability of harm.
We held in Zinck v. Whelan, 120 N.J. Super. 432, 444-445 (App. Div. 1972), citing Restatement, Torts 2d, §§ 447, 448 (1964), that:
* * * foreseeability of the asserted intervening intentional tort or crime need not be anticipated by the actor as a literally probable consequence of his action (i.e., more likely to occur than not in the particular instance), but merely that the actor "realized or should have realized the likelihood" that his action "might" create an opportunity for the third person to commit the tort or crime. As for the eventuation of the accident, the criterion of foreseeability is whether the actor should have realized that a thief "might so act" or whether a reasonable man, knowing the situation at the time of the thief's negligence, "would not regard it as highly extraordinary" that the accident had taken place.[2]
*397 We do not agree with the trial judge's conclusion in this case that the only inference warranted by the evidence was a "possibility of criminal conduct in this area"; hence, Reading's negligence, if any, in not having a fully operable lock on the switch was not a proximate cause of the derailment and damage as a matter of law. His concept of a loss proximately caused not by the conduct of defendant but rather by the act of a third party over whom defendant had no control and which was not reasonably foreseeable should be rejected. We are completely satisfied that the evidence and inferences therefrom, viewed most favorably to Mack and Heil, were sufficient to withstand the motion for judgment n.o.v. Since it was reasonable to infer that at least one purpose of the padlock was to keep the switch locked when not in use so as to prevent its being opened by unauthorized persons, it would be an anomaly for the railroad to contend now that liability ought not to attach for its negligent failure to detect and repair the broken lock, if, as a consequence thereof, someone tampers with the switch and damage results. As the Supreme Court said in Rappaport v. Nichols, 31 N.J. 188, 201 (1959), "negligence may consist in the creation of a situation which involves unreasonable risk because of the expectable action of another." Cf. Brower v. N.Y.C. & H.R.R.R. Co., 91 N.J.L. 190 *398 (E. & A. 1918). The case of Fredericks v. Northern Cent. R. Co., 157 Pa. 103, 27 A. 689 (Sup. Ct. 1893), to which the trial judge referred in his oral opinion, is distinguishable. See Baltimore and Ohio R.R. Co. v. Plews, 262 Md. 442, 278 A. 2d 287 (Ct. App. 1971). In the case under review, there was one known prior act of vandalism of a similar nature which had occurred nearby only a few years before. During 1971, in area of less than three miles, other acts, though not involving a switch, but resulting in damage to railroad property, had been reported. We are satisfied that there was sufficient evidence to support a jury finding that it was reasonably foreseeable that tampering might result from defendant's failure to repair or replace the defective lock. Cf. Braitman v. Overlook Terrace Corp., 68 N.J. 368, 380-383 (1975); see also Harpell v. Public Service Co-ordinated Transport, 20 N.J. 309 (1956).
It is to be stressed that proximate and intervening causes are ordinarily jury questions. Martin v. Bengue, Inc., 25 N.J. 359, 374 (1957); Brower v. New York C & H.R.R.R. Co., supra. So here; consequently, the trial judge was not justified in ruling as a matter of law that there was no issue of proximate causal relationship to be submitted to the jury. Granting the motion for judgment n.o.v. was error.
The trial judge also apparently questioned the propriety of his own charge, but any issue of error in the charge would obviously not be germane to a motion for judgment n.o.v. It would, however, be relevant with respect to the issue of whether a new trial should be granted.
We turn now to a consideration of the trial judge's alternate ruling that there should be a new trial in the event that the judgment n.o.v. would be overturned on appeal. On this matter, the trial judge merely said, "If the Court is wrong, then this Court would grant a new trial. I make this comment for the purpose of satisfying Rule 4:40-2(b) for the purpose of completeness of the record."
The cited rule requires the court, upon the granting of a motion for judgment accompanied by a motion for a new *399 trial, to rule also on the latter motion, determining whether it should be granted if the judgment is thereafter reversed or vacated. But we do not construe the rule as permitting a perfunctory disposition of the new trial motion. Ruling on such motion, we think, obligates the trial judge to evaluate the evidence in the same manner as though there were no motion for judgment, i.e., in accordance with the standard enunciated for new trial motions in Dolson v. Anastasia, supra, 55 N. J at 6-8: The motion should be granted only if, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly appears that there was a miscarriage of justice under the law. Id. at 7.
Our standard for reviewing the trial court's action on a new trial motion is essentially the same. Id. at 7. Consequently, it "behooves the trial judges in deciding new trial motions to spell out fully the reasons for their determinations so that reviewing tribunals may be advised of the extent to which factors entitled to deference entered into the decision." Id. at 7-8. It is evident, of course, that the trial judge here did not do so. However, such criteria as "witness credibility," "demeanor" and "feel of the case," to which deference must be given to the views of the trial judge thereon, are not of substantial significance in this case, with the possible exception of the expert testimony by the locksmith. Rather, we are concerned here essentially with such matters as "worth, plausibility, consistency or other tangible considerations apparent from the face of the record," which we are as competent to decide as the trial judge. Dolson v. Anastasia, supra. Therefore, we do not deem it either necessary or advisable to remand the matter to the trial court for a statement of the reasons for his determination
With respect to his charge to the jury, the trial judge said:
* * * After reading the standard charge on foreseeability, and explaining that criminal acts are not normally to be anticipated, the question I'm quoting from the Court's notes, "The question here is whether or not there was any notice to defendant of such act that *400 made it unreasonable for a defendant not to anticipate some criminal activity."
Upon reflection, the Court thinks that language should have been stated affirmatively, and more strongly in terms probability. It may well be that the jury considered that as a possibility, and grounds for a basis.
The portion of the charge referred to was as follows:
Now, as I have said, we have to judge this in the light of all the attending circumstances. You have to take into account the question of whether or not there was such notice to defendant, such that would make it reasonable for it to know, or make it unreasonable to consider that individuals would go that way. You have to weigh that factor very carefully, and you should consider all the evidence and all the credible evidence in the case in connection with evaluating those factors. Again, it's a question of what is reasonable, what is to be reasonably anticipated, and what action would the reasonable individual do under those circumstances.
We think that the trial judge was unnecessarily concerned over the excerpt in question. We are satisfied that he properly and fully instructed the jury with respect to the theories of liability asserted against Reading A reading of the entire charge discloses that it included all the essential instructions on negligence, foreseeability, notice, proximate cause and intervening cause. Notwithstanding that the excerpt may have lacked clarity or, standing alone, been subject to possible misinterpretation, we are convinced that when the segment is viewed in the context of the entire charge, there was no real possibility that the jury might have been misled or that it was "clearly capable of producing an unjust result." R. 2:10-2. Cf. Kuhner v Marlyn Manor, Inc., 135 N.J. Super. 582, 589 (App. Div. 1975).
As for the weight of the evidence, much of that which we said on the motion for judgment n.o.v. is equally pertinent here and requires no repetition. While a verdict may be properly set aside as contrary to the weight of the evidence, even though the state of the evidence would not justify the direction of a verdict at the close of the proofs, or the granting of a motion for judgment, Franklin Discount *401 Co. v. Ford, 27 N.J. 473, 490 (1958), we are completely satisfied that there were issues of fact here which were properly submitted to the jury for resolution, and that the jury's finding of negligence on the part of Reading was not a miscarriage of justice under the law. R. 2:10-1.
The judgment n.o.v. entered in the Law Division is reversed. The jury verdict in favor of Mack and Heil is reinstated, and the matter is remanded solely for the entry of an accordant judgment.
NOTES
[1] N.J.S.A. 2A:137-1, to the extent pertinent here, provides that any person who willfully or maliciously "[t]urns, moves or diverts any switch * * * belonging to a railway" is guilty of a high misdemeanor * * *"
[2] We take note that in Hill v. Yaskin, 138 N.J. Super. 264 (App. Div. 1976), another part of the Appellate Division expressed disagreement with the specific holding in Zinck that it is reasonably foreseeable by an owner that a motor vehicle left unlocked on a public street with the key in the ignition creates an enhanced hazard of theft of the vehicle and ensuing negligent operation by the thief, with consequent injury or damage to others on the highway. This divergence of views is now before the Supreme Court by virtue of its grant of certification. 70 N.J. 279 (1976). But see Braitman v. Overlook Terrace Corp., 68 N.J. 368, 381-382 (1975), wherein the court, while expressly leaving open the question of the reasonable foreseeability of the stolen vehicle being involved in an accident while being driven by the thief, otherwise agreed with the court's analysis in Zinck as to the foreseeable consequence of negligence in relation to the intervention of the activity of a thief. The clash seems to pertain not to the principle enunciated but to its application to a particular set of facts.